UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KOTCHEN & LOW LLP, 1745 Kalorama Road, NW, Suite 101 Washington, DC 20009, | Civil Action No.: |
| Plaintiff, | COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| PRECISION DISCOVERY, INC., and JERRY BARBANEL, | |
| Defendants. | |

## COMPLAINT

1. Defendant Precision Discovery, Inc. ("Precision") has filed an arbitration against Plaintiff Kotchen & Low LLP ("K&L") seeking over $3 million in unpaid bills for electronic data processing, hosting, and related charges, costs, and fees. But a federal court has already held that Precision's fees were "not reasonable." And K&L explicitly refused Precision's request that K&L sign an arbitration agreement related to the electronic discovery services at issue.

2. K&L files this action seeking declaratory judgment that Precision's arbitration claims are barred by the doctrines of *res judicata* and issue preclusion and that they are not subject to arbitration. K&L also asserts related affirmative claims against Precision and against Precision's CEO, Defendant Jerry Barbanel.

3. Precision took advantage of a court discovery sanctions order that required K&L to retain a discovery expert (Precision), that required the sanctioned party (Delta Air Lines, Inc.) to pay Precision's bills, and that – at Delta's request – denied K&L access to the Delta documents

and data that Precision was analyzing, thereby limiting K&L's ability to effectively oversee Precision's work.

4.      Precision declined to follow K&L's instructions to limit its scope of work, claiming that Precision was serving at the direction of the court and not K&L, and that the court's order required that the work be performed; Precision made false and misleading statements to K&L about the work being performed; and Precision billed for work that had not been performed properly. In 2013, a federal court found that Precision's billings were "not reasonable," and that a 50% reduction in Precision's initial $4.9 million in billings was appropriate. In 2014, Precision filed an arbitration against K&L seeking to recover the remaining $2.45 million from K&L, along with $485,558 in additional charges for hosting data that K&L never requested that Precision host.

5.      Precision's misconduct led to multiple reductions in the attorneys' fees and expenses that K&L would have recovered as discovery sanctions, and has adversely affected and delayed K&L's prosecution of the antitrust lawsuit *In re Delta / AirTran Baggage Fee Antitrust Litigation*, MDL 2089 (N.D. Ga.) (hereafter "*Baggage Fee Litigation*").

### The Parties

6.      Plaintiff Kotchen & Low LLP is a small law firm, with its principal place of business in Washington, DC. K&L has two partners and two associates. K&L is a litigation boutique that, among other things, represents consumers in class action lawsuits, including antitrust price-fixing cases. K&L was appointed primary co-lead counsel in the *Baggage Fee Litigation*.

7.      Defendant Precision Discovery, Inc. is incorporated in New York and has its principal place of business in New York. Precision has two separate divisions: a Computer

Forensics division, and an E-Discovery division. During the relevant time period, Precision's E-Discovery offices were located in California, and later moved to Colorado.

8.      Defendant Jerry Barbanel is the President and CEO of Precision.  Mr. Barbanel is a resident of New Jersey.

## Jurisdiction and Venue

9.      The Court has subject matter jurisdiction pursuant 28 U.S.C. § 1332 and 1441(a) (diversity jurisdiction), because diversity of citizenship exists between the parties, and the aggregate amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and pursuant to 28 U.S.C. § 2201.

10.      Venue is proper in this district pursuant to 28 U.S.C. § 1391, as one or more of the Defendants transact substantial business in this District, Plaintiff K&L resides in this district, and Precision marketed its services to K&L in this district both in person and via the internet.

## Facts

### The Delta Baggage Fee Lawsuit and November 2012 Order

11.      Kotchen & Low LLP was appointed as the primary co-lead counsel for a proposed class of airline passengers in the *Baggage Fee Litigation*, a multi-district antitrust price-fixing lawsuit. K&L filed suit against Delta Air Lines, Inc. ("Delta") and AirTran Airways, Inc. ("AirTran") in May 2009, alleging that the two airlines conspired to impose first bag fees.  The Department of Justice has an ongoing parallel antitrust investigation of Delta and AirTran concerning first bag fee collusion and has opened a second investigation of Delta, Southwest Airlines, Inc. (which acquired AirTran), and two other airlines concerning collusion to reduce capacity and charge consumers inflated prices. Delta and Southwest are now defendants in dozens of class action lawsuits related to the second DOJ investigation.

12.     K&L learned in 2010 and 2011 that Delta had improperly destroyed relevant back-up tapes, had withheld relevant documents from the hard drives of key custodians, and had withheld documents from relevant backup tapes, despite representations by Delta's counsel that all responsive documents had been produced and that no relevant backup tapes existed. In February 2012, the Court issued an Order sanctioning Delta and re-opening discovery.

13.     Between February and August 2012, K&L took discovery related to Delta's discovery efforts, and learned that there were additional data sources that Delta had failed to preserve, and additional data sources containing responsive documents that Delta had failed to search. On November 19, 2012, after Delta admitted the existence of additional unsearched data sources, the Court ordered K&L to retain a discovery expert to investigate Delta's document production efforts, and ordered Delta to pay related fees and expenses incurred by the expert and by K&L. The November 2012 Order provided a 30-day deadline within which K&L would retain the expert, the expert would conduct its investigation, and the expert would provide a report to the Court. The Order provided that the expert would have broad access to Delta's documents and data, but that K&L and its co-counsel would not be permitted to access Delta documents or data, as they may contain privileged information. This restriction – which had been requested by Delta – limited K&L's ability to oversee the work of the expert.

*K&L's Contract with Precision's Computer Forensics Division*

14.     K&L interviewed several discovery experts, including Bruce Pixley, Vice President of Precision's computer forensics division.  Precision's Computer Forensics division operates independently from Precision's Electronic Discovery ("E-Discovery") division. The two divisions perform separate functions, are located in different offices, have different personnel, bill separately, and enter into separate retainer agreements with clients.

Case 1:16-cv-00224-CK Document 1-3 Filed 02/10/16 Page 5 of 26

15.     On November 25, 2012, as ordered by the Court, K&L entered into a retainer agreement with Bruce Pixley for the "perform[ance] of computer forensic services." (Exhibit A). The retainer agreement between K&L and Precision's Computer Forensics division contained an arbitration clause, but the present dispute between the parties relates to E-Discovery, not Computer Forensics, and the Computer Forensics arbitration clause does not apply.

16.     Mr. Pixley requested two extensions of time to conduct his investigation and complete his report, which he submitted to the court on May 20, 2013. As part of his investigation, Mr. Pixley interviewed witnesses, collected data, analyzed Delta's data and computer equipment, and restored e-mails and other files that had been deleted. Mr. Pixley determined that certain data sources had been destroyed by Delta, and that some relevant data sources had not been properly searched.

### K&L Contracts with Precision's E-Discovery Division for the Processing of 70 GB of Data for $27,300

17.     In early January 2013, Mr. Pixley and K&L discussed analyses that could be performed to demonstrate that Delta had destroyed and withheld relevant documents. Mr. Pixley informed K&L that certain analyses would require K&L to separately retain Precision's E-Discovery division. The E-Discovery division would process native format data collected by Pixley from hard drives or servers, de-duplicate them against what Delta's e-discovery vendor, Stratify, had processed or produced to the class action plaintiffs, and then analyze unique items to determine whether they were relevant to the issues in the first bag fee litigation.

18.     On January 4, 2013, Precision's E-Discovery Vice President requested K&L's approval of a Statement of Work to perform this analysis, stating in the cover e-mail: "Please find [attached] the statement of work for the estimate regarding the processing and hosting of the initial Stratify data set. Upon your approval, we will move forward with the processing and hosting of

this initial data set." The Statement of Work contained $468,000 in E-Discovery processing charges for the processing of 1200 gigabytes ("GB") of data. Concerned by the $468,000 request, K&L rejected the Statement of Work.

19.     K&L and Precision discussed ways to limit the scope of work to make the project more economical, such as by limiting the project to the files of a few custodians. On January 16, 2013, Precision submitted a revised Statement of Work to K&L. The January 16 Statement of Work provided that certain data for "5 custodians" from two datasets "will be processed which will allow for a comparison analysis," and that Precision "will attempt to recover deleted email from . . . 5 designated custodian datasets." The Statement of Work stated that the e-discovery processing charges would amount to $19,500 (rather than the initial $468,000).

20.     While the revised cost was acceptable to K&L, the proposed Statement of Work between K&L and Precision's E-Discovery division contained a variety of terms and conditions, including an arbitration provision, that were unacceptable to K&L. As a result, K&L refused to sign the Statement of Work even after agreeing on the scope of the project.

21.     After analyzing which key custodians' files should be analyzed, K&L and Precision agreed that Precision would search the files of 7 custodians. On January 24, Pixley sent K&L a revised "Quote for eDiscovery follow-up work" prepared by Precision's "Electronic Discovery Services" division. (Exhibit B). The quote listed 70 gigabytes of data processing charges for 7 custodians, amounting to $27,300. The written "Quote" provided that "[t]his is not a statement of work, but simply a quotation . . . . Should counsel or the client engage Precision Discovery for this work, a formal Statement of Work will be prepared[.]"

22.     K&L responded to the quotation in a January 24, 2013 e-mail to Bruce Pixley, stating: "Please proceed with the eDiscovery analysis that's reflected in the attachment. From our

conversations with you, we understand that this is analysis that you have requested and that is being conducted as part of your efforts to comply with the Court's Order." (Exhibit C). Precision's E-Discovery division never prepared a formal Statement of Work related to the informal "quotation," and K&L never signed a written retainer with Precision's E-Discovery division. Instead, a contract was created based on: the offer contained in K&L's January 24, 2013 e-mail, which was an offer to guarantee payment to Precision for the $27,300 in processing charges for 70 GB of data; and Precision's acceptance of that offer, which was effected by Precision's performance of the processing of the 70 GB of data related to the 7 identified custodians. K&L never approved any subsequent changes to the $27,300 / 70 GB contract.

***Precision Bills K&L $3,728,895 for the Unapproved Processing of 9,561 GB of Data***

23.     On April 2, 2013, Precision e-mailed K&L an invoice for E-Discovery services for $772,291, which included data processing charges of $765,238 for 1,962 GB of data (as opposed to the 70 GB that K&L had approved). Dismayed, Kotchen e-mailed Precision requesting a call to discuss the invoice. The next day, he spoke with Avery, Pixley, and Barbanel about the invoice, expressing "sticker shock" at the size of the invoice and expressing that K&L did not want Precision to process so much data. During the call, Avery stated that he had not given K&L an estimate as to how much the processing would cost prior to processing the data (as he said he would) because Precision was concerned about the upcoming report deadline, and providing an estimate would have meant stopping the data processing. Avery said that focusing on only 7 custodians – as K&L had approved – was not workable in light of the requirements of the Court order. Avery also said that Precision was already discounting its processing prices by 29-30% and did not want to further discount the prices. Avery said Precision had not yet started processing the

Stratify data. Kotchen told Precision to hold off on processing the Stratify data until after receiving K&L's approval.

24.     Jerry Barbanel said that, under his reading of the Order, Delta was required to pay for the processing, and that he would have no problem explaining to Delta (or the Court) the reasonableness of Precision's processing efforts. K&L was forced to largely rely on Precision's assessment of what steps were reasonable and appropriate because Precision possessed technical expertise and experience, and because K&L was barred by the November 2012 Order from viewing Delta documents and data because of Delta's privilege and confidentiality concerns. Precision's representations about the reasonableness of its billings was material to K&L because, if Precision's billings were reasonable, Delta would be required to pay Precision's bills pursuant to the November 2012 Order.

25.     Precision and K&L had another call scheduled for April 10, 2013. Precision canceled the call approximately 20 minutes before the call was supposed to occur. Low told Precision that K&L wanted to have a discussion with Precision about the Stratify data before Precision processed the Stratify data, and requested that a call be scheduled promptly. Precision stated that it had already started processing the Stratify data, and that Precision processes data as soon as it receives it.

26.     A conference call took place on April 11, 2013 between Barbanel, Avery, Kotchen, Low, and several others. During the call, K&L again expressed shock at the processing charges. Jerry Barbanel responded that Precision would continue processing data regardless of whether K&L wanted Precision to do so because Barbanel said he believed that the Court's November 2012 Order *required* Precision to carry out the data processing and analysis. Barbanel stated that Precision had been retained by the Court to perform the analysis, not by K&L, and Barbanel stated

that Delta would not object to paying the bills, which he again represented would be reasonable and readily justifiable. When K&L asked how much more data Precision intended to process, Precision stated that its data processing was almost complete.

27.     During late April and early May, Avery and Barbanel repeatedly assured Kotchen and Low that Precision's data processing was almost finished and that it would complete its analysis of the data before the May 20, 2013 deadline for Precision's report.

28.     On May 6, 2013, Precision issued an E-Discovery invoice for work performed in April 2013 amounting to $1,860,541. Of this, $1,837,430 was for the processing of 4,711 GB of data. K&L responded the next day, questioning Precision about its charges based on concerns that Delta raised on May 6 about earlier invoices. For example, Delta had inquired what work was encompassed within the data processing charges, and asked for additional details about certain other charges. Avery finished responding to these questions on May 16, stating that the fees were "in line" with industry standards, and necessary "to fully comply with the Court Order." Avery demanded immediate payment of Precision's fees. K&L provided Precision's responses to Delta on May 19, along with the April invoices.

29.     Precision issued an E-Discovery invoice for May 2013 in the amount of $1,270,192, of which $946,483 was for processing 2,427 GB of data. Consistent with Barbanel's stated belief that Precision was retained by the court rather than by K&L, Precision first sent the invoice to the Court and to Delta – but not to K&L – on June 10, 2013. After K&L requested a copy from Precision's counsel, K&L received a copy of the invoice on June 17, 2013.

30.     In all, Precision billed K&L a total of $4,102,020 for E-Discovery services in 2013, of which $3,728,895 was for the processing of 9,561 GB of data. By contrast, K&L had only approved Precision's request for $27,300 in processing charges for 70 GB of data. Similarly,

Precision billed $255,815 for "Conceptual Search Indexing" of 2,558,155 documents, whereas the approved 70 GB would have contained approximately 200,000 documents and would have cost only about $20,000 to index. And Precision billed $96,286 for hosting approximately 1,935 GB of data, whereas hosting 70 GB would have cost only about $3,500.

31.     K&L later learned that Precision's effort to process vast quantities of data was being directed by Jerry Barbanel, an attorney, not by a discovery expert.  Specifically, K&L learned that Barbanel was concerned that Precision's E-Discovery division was facing a revenue shortfall in its budget of approximately $4 million for the fiscal year and was receiving pressure from his Board of Directors about this shortfall.  After studying the Court's November 12 Order for the *Baggage Fee Litigation*, Barbanel decided that he could try to use the Order to cover the shortfall.

32.     After Barbanel conducted his analysis, he instructed Precision's E-Discovery division to process large amounts of data to generate invoices to fill the $4 million budget gap without obtaining approval from K&L for expanding the scope of work. Instead of limiting the analysis to the 7 identified custodians, Barbanel instructed the E-Discovery division to process data of every relevant custodian, including individuals who had been named as custodians for limited purposes and limited searches, and to also process data that did not belong to any known custodian, and to process data outside the relevant time period.

33.     K&L learned in 2014 that this was not the first time that Barbanel and Precision have engaged in suspect business practices. In an unrelated case, Mr. Barbanel and Precision were sued in August 2014 for millions of dollars related to a scheme to defraud the government by creating a related entity and falsely and fraudulently claiming that the entity qualified for preferential treatment.  Complaint ¶ 89, *Arnold v. Barbanel, Precision Discovery, et al.*, No. 1:14-cv-6457 (S.D.N.Y.) ("Barbanel, as was his practice, was lying.").

*Precision's Overbilling Results in a Hearing Regarding the Reasonableness of Precision's Fees*

34. Precision submitted its report to Delta and the Court on May 20, 2013, but K&L initially did not receive a copy (because of Delta's privilege and confidentiality concerns). K&L received a redacted copy on June 14, 2013. In the report, contrary to its assurances to K&L that its investigation would be completed by the time the report was due, Precision stated that its investigation was not complete, and that it "intend[ed] to provide a supplemental report to the Court within 60 days."

35. Precision's report included a section authored by Pixley, and a separate section entitled "Report Prepared by Precision Discovery's Electronic Discovery Practice." The E-Discovery report was approximately 35 pages long, and was signed by Precision's Vice President of E-Discovery, Thomas Avery. As discussed further below, the court later determined that portions of the E-Discovery report were flawed or inaccurate. The E-Discovery report was so unreliable that, in a subsequent motion for sanctions against Delta, K&L was unable to rely on any portion of the E-Discovery report.

36. After reviewing Precision's report, Delta wrote to the court on May 28, 2013 complaining that Precision had: "demand[ed] immediate payment of more than $3.5 million in fees and costs incurred through April"; failed to comply with the court's order listing what the report should include; "usurped the Court's authority" by assigning itself "an ongoing role as document host" and by providing itself a 60-day extension to complete its report; conducted a "seriously botched analysis of the data"; and reached conclusions based on a "persistent misapprehension of basic discovery concepts." In the letter, Delta requested that the court require Precision to immediately stop work and that the court hold a hearing.

37.     On June 3, 2013, the court ordered that "Precision Discovery shall immediately cease and desist providing any services in this case except to the extent expressly requested by Defendant Delta," and scheduled a hearing at which Precision was ordered to "appear and offer evidence and/or argument in support of the reasonableness of their fees and expenses charged in this case." A day-long hearing was held on July 24, 2013 at which Precision presented evidence on the reasonableness of its fees, which totaled $4.9 million. Precision retained separate counsel to present its case. Precision offered its Vice President of E-Discovery services (Avery) to testify to the reasonableness of Precision's E-Discovery services invoices, and its Vice President of Computer Forensics services (Pixley) also offered testimony on the reasonableness of Precision's fees. Precision's Jerry Barbanel was present in the courtroom but did not testify. Delta presented its own expert, Eric Friedberg, who testified that Precision's fees were not reasonable.

38.     Precision testified that K&L signed "the standard form engagement letter that Precision uses for Computer Forensic assignments," and that Precision had presented K&L with a separate Statement of Work for E-Discovery services. Precision testified that there is a distinction between computer forensics work and e-discovery work: "Computer forensics is usually driven by a single examiner looking for specific artifacts and windows artifacts, things of that nature, that would be much more investigatory, whereas electronic discovery is dealing with large volumes of data for the intention of processing that data and then hosting that data in a review platform so that it can be reviewed for relevance and ultimately turned over for production."

39.     Pixley testified to Precision's position that it was retained by the court rather than by K&L, stating that "ultimately this was [Precision's] investigation. This wasn't for [K&L] to direct the investigation."

40.     Avery testified that Precision's per gigabyte processing charge of $390 per GB was its "standard charge." Avery testified that the rate "included the data processing, which is where we take data, we enumerate it, we hash that data for the purposes of deduplication, and then in this case we generated hash values for the purposes of comparison later. We extract metadata from each file, and then ultimately we pull that data out. And should it require to be hosted in [a] review tool so we can examine it further, we export that data and then host it in review. But in this particular case that $390 fee also included all of my data analyst time in regards to doing the data comparison and the data analysis, and looking at the data for the purpose of this investigation as well as it included the report writing time . . . ." Months early, Avery had represented to K&L that the processing charge also included extraction of text, optical character recognition, deduplication, and building of load files.

### *The Court Holds That Precision's Fees Are "Not Reasonable"*

41.     The court issued an order on September 25, 2013 regarding Precision's fees. The court found that "the course of work Precision pursued was not reasonable" and reduced Precision's fees by fifty percent, finding Delta responsible for the other fifty percent because "Precision is involved in this case because of Delta's second admission that it yet again mishandled electronic discovery." The court found that Precision should have informed the court before it processed such a large volume of data and before it restored all of Delta's backup tapes. The court expressed "skeptic[ism]" about Precision's explanation that it needed to redo and expand the work performed by Delta's original vendors in order to be confident that they had performed the work correctly, but found that "Delta is not completely blameless; its vendors are the ones who caused the expansion of Precision's work." The court found that "there were more efficient, less expensive ways to comply with the November 19 order." The court recognized that the Statement of Work

Avery presented to K&L reflected data processing for only 5 to 7 custodians for approximately $20,000, and that "the record does not contain an updated statement of work reflecting the new expanded scope of the project."

42.     The court also expressed concerns that Precision's database "contains thousands of irrelevant picture files, tens of thousands of documents outside the relevant date range for this case, and over 100,000 documents responsive to search terms the parties previously agreed to drop." The court observed that Avery had admitted that "the tagging analysis . . . in the report is wrong." The court stated that "Precision chose a course that was expensive, time-consuming, and produced inconclusive results." Going forward, the court decided that "having Precision complete its work is not in the best interest of this case" because "Precision has muddied the waters even more with its own actions." Thus, because Precision had wasted time processing irrelevant data for its own benefit, Precision never completed the analysis of the seven custodians that K&L had requested and approved.

43.     Of the $4,899,501 that Precision had billed, the court ordered Delta to pay 50%, or $2,449,751. The court found that this amount "represents the reasonable value of the services provided to date by Precision in this case."

44.     During the July 24, 2013 hearing, counsel for the *Baggage Fee Litigation* plaintiffs asked that the court ensure that K&L not get stuck with any liability for Precision's fees, as the court had ordered K&L to retain the expert, and had ordered Delta to pay the expert's fees. The court responded that, "if Precision were to come after [K&L], I think [K&L] could easily contest any effort to collect the difference between what I award and what is allegedly owed by asserting the defense that *the fees weren't reasonable*. You've got a federal judge who says that[.]"

45.     Despite the court's finding that Precision's fees were "not reasonable," and despite the court's statement that K&L should be able to "easily contest any effort to collect the difference between what I award and what is allegedly owed," Precision filed an arbitration against K&L on September 23, 2014 for the unpaid $2,449,751, along with $485,558 in additional unapproved hosting charges, described below. Precision's claim for the $2,449,751 is barred, however, by the doctrine of *res judicata* or issue preclusion, as "the fees weren't reasonable. You've got a federal judge who says that."

**The Court Reduces K&L's Fees by 50% Based on Precision's Unapproved Expansion of the Scope of Work**

46.     In the November 2012 order sanctioning Delta for its discovery misconduct, the court ordered Delta to pay "all fees and costs . . . incurred by Plaintiffs' counsel as a result of the directives in this Order." Between November 2012 and August 2013, K&L – primary co-lead plaintiffs' class counsel in the *Baggage Fee Litigation* – expended a substantial amount of time and resources investigating Delta's misconduct. The investigation of Delta's discovery misconduct consumed a substantial portion of the resources of K&L, which has only four attorneys.

47.     During the hearing, Precision inaccurately suggested that it had kept K&L informed about the expenses being incurred by Precision, and of Precision's plans to process thousands of gigabytes of data. But K&L never approved processing of any data in excess of 70 gigabytes and was never informed of how much data Precision intended to process.

48.     Similarly, Precision misleadingly represented that it had informed K&L that it was running search terms against random non-custodian employees on backup tapes to see if the hits helped identify potential new custodians. In fact, however, Precision did not inform K&L of this until on or around May 19 or 20, after it had already been done, at which time K&L objected and requested that Precision drop any such analysis from its forthcoming May 20 report.

49.     The court's order setting the July 24, 2013 hearing had stated that the hearing would relate to Precision's fees, not plaintiffs' counsel's fees. K&L did not participate in the hearing and expressed through counsel that "[w]e are not intending to participate in the issue of whether these [Precision] fees were reasonable or excessive or whatever." Thus, Precision's inaccurate and misleading testimony about K&L's oversight went unrebutted.

50.     In its September 25, 2013 order finding Precision's fees unreasonable, the court found that K&L was partly at fault for the unreasonable scope of Precision's work, and therefore reduced the award for K&L's fees and costs by fifty percent, *i.e.*, a reduction of hundreds of thousands of dollars. For example, the order stated that: "Pixley testified that he informed Plaintiffs' counsel of the increasing electronic-discovery costs during their regular phone calls"; "Precision was Plaintiffs' expert, and Plaintiffs' counsel were responsible for managing its work"; according to Precision, "Precision talked with Plaintiffs' counsel about its decision to [extract, process, and search files of non-custodians]"; "According to Pixley's testimony, Plaintiffs' counsel decided not to raise the [data-processing] issue with the Court."

51.     If Precision had not unreasonably expanded the scope of its work and processed over 9,500 GB of data against K&L's wishes, K&L's fees and costs would not have been cut by 50% by the court. Moreover, the underlying litigation against Delta was delayed while the court addressed the issue of Precision's unreasonable fees.

***Precision Demands $485,558 in Unapproved Hosting Charges***

52.     Precision's computer forensics expert, Bruce Pixley, left Precision in 2013. K&L retained Pixley to help demonstrate that Delta had committed discovery violations. K&L wanted Pixley to conduct additional analysis of the Delta data, as Precision had not completed this analysis. Pixley did not have access to the data after he left Precision, so at the request of K&L,

the court entered an order directing Precision to "make available to Mr. Pixley . . . all files, e-mails, data, documents, analyses, databases, or tangible things related to this matter, at Precision's offices in Camarillo, California as needed." Pixley then requested from Precision a copy of a database that Precision had sent to Delta on an external hard drive, which contained 370,871 documents. Instead of making an electronic copy of that database available to Pixley at Precision's offices in Camarillo as he had requested and as the court's order contemplated, Precision instead sent Pixley a login and password for an e-discovery database containing 1,979 GBs of data – amounting to approximately 8 million documents – being hosted on Precision's servers. Because the database contained substantially more documents than Pixley requested, and was not limited to the documents that Precision had sent Delta, it was cumbersome for Pixley to search, and Pixley could not determine which documents had been sent to Delta for review, as necessary for some of the analyses that K&L had requested.

53.     In April 2014, Precision generated an invoice addressed to K&L for almost $70,000, almost entirely for hosting 1,979 GB of documents. Precision sent the invoice to one of K&L's co-counsel, but not to K&L. In May 2014, Precision sent an invoice to K&L for over $70,000 almost all of which was for hosting of the 1,979 GB of documents. K&L informed Precision that it did not intend to pay the invoices, as K&L never requested that Precision host the data. Precision subsequently stopped invoicing K&L for the hosting charges. Nonetheless, Precision's arbitration against K&L seeks $485,558 in data hosting charges from K&L, most of which were never even invoiced to K&L.

***K&L Learns of Additional Flaws in Precision's Work and Is Unable to Rely on the Electronic Discovery Report***

54.     After the court's order finding that Precision's fees were unreasonable, K&L learned of additional flaws in Precision's work. For example, after reviewing a database of

17

documents prepared by Precision, Delta produced a small number of responsive documents to
K&L that had not previously been produced. K&L observed that many of the documents lacked
required metadata, which was necessary for K&L to fully analyze and understand the significance
of the new documents. For example, the origin of newly produced documents was significant to
whether the documents had been withheld or destroyed in bad faith, *e.g.*, if the document came
from a key custodian's deleted items folder after a litigation hold was in place, this could be
evidence that Delta had deleted documents in bad faith. In November 2013, K&L asked Pixley
whether documents had been provided to Delta with relevant metadata, and he confirmed that
Precision had told him that relevant metadata had been included in the database. In a brief filed
with the court, K&L accused Delta of failing to provide the relevant metadata. In its response,
Delta represented that the data that Delta had received from Precision lacked extracted metadata
for those documents. Bruce Pixley later confirmed that, in the database of approximately 8 million
documents made available to him in December 2013, millions lacked extracted metadata. This was
inconsistent with Precision's representations that metadata extraction was part of its processing
charge, and inconsistent with Precision's invoices for the full $390 per GB data processing rate for
all 9,561 GB of processed data.

55.     In pursuing a motion for discovery sanctions against Delta based partly on
Precision's Computer Forensics investigation, K&L was unable to rely on the Electronic
Discovery report because of its extensive flaws and inaccuracies. K&L informed the court and
Delta that it would not rely on the E-Discovery report, and made no reference to the E-Discovery
report in its subsequent filings (except a few inadvertent references that were removed in a
corrected filing). The flaws in the E-Discovery report included, *e.g.*, a tagging analysis in which
Precision inaccurately claimed, after incorrectly loading Delta's tagging data, that Delta had

tagged only 20% of the documents that its document reviewers were supposed to review for production, and that 80% had gone unreviewed. Avery admitted that this analysis was wrong.

56.     Similarly, Delta wrote that the E-Discovery report is "fraught with a persistent misapprehension of basic discovery concepts such as the rationale for selecting document custodians." Precision ran broad search terms against random employees, and after finding numerous search term hits, concluded that Delta did not properly identify custodians, and suggested that the court should consider requiring Delta to collect data from 120 new "custodians." K&L had asked Precision not to include this flawed analysis in its report.

57.     In the dataset of documents that Precision sent Delta for review, Precision included numerous documents that should not have been included. For example, Precision admitted that image files such as .jpg and .bmp files are "typically" filtered out, but that Precision had not filtered them out here. Instead, Precision included in the database it sent to Delta thousands of irrelevant ocr'ed image files, including, *e.g.*, a picture of pop singer Kelly Clarkson that Delta repeatedly mocked as obviously irrelevant. Similarly, Precision included over 87,000 documents that were created outside the relevant time period.

### The Court's 2015 Order Again Reduces K&L's Recovery of Fees and Expenses Based Partly on Precision's Expanded Scope of Work

58.     In an August 3, 2015 Order, the *Baggage Fee Litigation* court awarded certain attorneys' fees and expenses to K&L, but denied K&L's requests for certain other fees, including certain fees for November 2012 to May 2013, finding based on Precision's inaccurate testimony at the July 2013 hearing that "many of the efforts of Plaintiffs' counsel during those six months [from November 2012 to May 2013] dramatically and improperly expanded the scope of Precision's engagement," and that "there is no rational basis from which to discern what efforts

19

during this time period . . . represent . . . time spent unnecessarily expanding the scope of Precision Discovery's engagement."

***Because of Precision's Misconduct, K&L Was Forced to Expend Resources Defending Against a Lawsuit Filed by Trusted Data Solutions***

59.     In 2013, Precision subcontracted with Trusted Data Solutions LLC ("TDS") to extract data from Delta backup tapes. Jerry Barbanel instructed that data be extracted from all of the tapes, including tapes that did not contain data relevant to the *Baggage Fee Litigation*. TDS billed $264,961 in fees and expenses for its work, and because of the unreasonableness of Precision's efforts, the court ordered that Delta pay only half of TDS's bills.

60.     TDS sued K&L in federal court for the remaining $132,481, plus attorney's fees, costs, and interest. *See Trusted Data Solutions, LLC v. Kotchen & Low LLP*, No. 1:14-CV-1419 (N.D. Ga.). The court granted K&L's motion to dismiss the TDS complaint, as K&L never contracted with TDS, and the "factual allegations do not give rise to an inference that Precision acted as K&L's agent when it retained TDS." Nonetheless, K&L was forced to expend resources defending against the TDS lawsuit, including attorney fees and out-of-pocket expenses.

***Precision Discovery Files an Arbitration Against Kotchen & Low LLP***

61.     On September 23, 2014, Precision Discovery filed an arbitration against K&L, demanding payment from K&L of $2,935,309, plus fees and costs, *i.e.*, a total amount that would exceed $3 million.

62.     Precision relied on an arbitration provision contained in its Computer Forensics division's November 25, 2012 retainer agreement with K&L. (Exhibit A). But the Computer Forensics retainer explicitly applied only to Computer Forensics services. K&L and Precision entered into a separate agreement with respect to E-Discovery services. (Exhibit C). When

20

Precision asked K&L to sign the proposed E-Discovery agreement that contained an arbitration provision related to e-discovery services, K&L refused.

63.     Precision's Computer Forensics invoices totaled $797,481. K&L arranged for payment of $458,827 towards the Computer Forensics invoices. The court ordered Delta to pay Precision an additional $1,794,116, fully paying the remaining $338,654 owed to the Computer Forensics division, but reducing the E-Discovery fees because the court found that the data processing billed by Precision's E-Discovery division was "not reasonable." Thus, Precision's Computer Forensics division has been paid in full for the work it performed, and Precision's claim against K&L does not relate to the Computer Forensics agreement.

64.     K&L has therefore challenged the arbitrability of the dispute. The arbitration has not yet progressed beyond the selection of the three-arbitrator panel.

### D.C. Law Applies

65.     D.C. law applies to this dispute. The first meeting between Precision and K&L occurred in Washington, DC in November 2012, at which Low met with Precision's Kinny Chan. Low and Chan discussed the services offered by Precision, including Precision's e-discovery services, and the services that would potentially be needed by K&L in the *Baggage Fee Litigation*. K&L e-mailed its agreement to the 70 GB of e-discovery data processing from DC, and largely communicated with Precision from its offices in DC. K&L is headquartered and incorporated in DC. Although Precision's proposed Statement of Work for E-Discovery services contained a New York choice of law provision, K&L refused to sign the Statement of Work.

### Causes of Action

*Count I:  Declaratory Judgment, 28 U.S.C. § 2201*

66.     Plaintiff repeats and realleges the allegations in Paragraphs 1- 65 above as if fully set forth herein.

67.     An actual controversy has arisen and now exists between Precision and K&L concerning their respective rights and duties in that K&L contends that their dispute is not arbitrable, but Precision has filed an arbitration against K&L seeking payment of approximately $3 million from K&L, including attorneys' fees in that proceeding. Precision claims that the November 2012 agreement entered into between K&L and Precision's Computer Forensics division governs disputes between the parties related to e-discovery.

68.     K&L has objected to the arbitrability of that dispute, as the parties have a separate agreement regarding e-discovery, and Precision's E-Discovery services division operates independently from its Computer Forensics division, with separate duties, offices, personnel, retainers, invoices, etc.

69.     In addition, an actual controversy has arisen between the parties because K&L contends that Precision's claim for $2.45 million against K&L is barred by the doctrines of *res judicata* and issue preclusion, as a federal court has already determined that Precision's fees were "not reasonable," but Precision has filed an arbitration seeking payment of those fees.

70.     K&L desires a judicial determination of its rights and duties, including a declaration as to the arbitrability of the dispute and a declaration as to the applicability of issue preclusion or *res judicata*.

71.     A judicial declaration is necessary and appropriate at this time under the circumstances in order that K&L may ascertain its rights and duties, and to avoid the burden and expense of an arbitration, which will require a significant investment in time and resources, including the expense of a three-arbitrator panel.

*Count II: Breach of Contract*

72.     Plaintiffs repeats and realleges the allegations in Paragraphs 1 - 71 above.

73.     K&L entered into an agreement with Precision for Precision to process 70 GB of data at the rate of $390 per GB.

74.     K&L complied with its obligations under the agreement, including by arranging for payment for the processing of the agreed upon 70 GB of data.

75.     Precision breached the agreement by processing 9,561 GB of data and billing K&L for that data despite K&L's explicit refusal to approve data processing of more than 70 GB. Precision also breached the agreement by failing to timely complete the processing and analysis of data and by failing to properly process the data by, *e.g.*, failing to extract relevant metadata.

76.     K&L was damaged by Precision's breach of the agreement. Precision's breach led to multiple reductions in K&L's fees, led to ancillary litigation with TDS, was harmful to K&L's litigation of the *Baggage Fee Litigation*, and caused other harm.

*Count III:  Breach of the Implied Covenant of Good Faith and Fair Dealing*

77.     Plaintiff repeats and realleges the allegations in Paragraphs 1 - 76 above.

78.     K&L entered into an agreement for Precision to process 70 GB of data and conduct related analysis.

79.     K&L complied with its obligations under the agreement, including by arranging for payment for the processing of the agreed upon 70 GB of data, and all the conditions required for Precision's performance under the agreement had occurred.

80.     In violation of the implied covenant of good faith and fair dealing, Precision unreasonably expanded the scope of work of the project to increase its own fees, and Precision

inaccurately told the court that K&L had been informed about the charges being incurred and that K&L had at least implicitly approved of the charges.

81.     As a result of Precision's misconduct, Precision denied K&L the benefits of the parties' agreement, as Precision did not complete the requested analysis, Precision's data processing was incomplete and flawed, and Precision's E-Discovery report was so flawed that K&L was unable to rely on it. In addition, K&L's fees were repeatedly reduced, K&L was forced to engage in ancillary litigation with TDS, the *Baggage Fee Litigation* was harmed and delayed, and other harm was caused.

*Count IV:  Fraud*

82.     Plaintiff repeats and realleges the allegations in Paragraphs 1 - 81 above.

83.     Precision made several fraudulent statements to K&L. During a phone call on April 3, 2013, Barbanel and Avery told Kotchen that Precision had discounted its prices by approximately 30%, that the work being performed by Precision was required by the court's order, and that the scope of work being performed was very reasonable. During an April 10, 2013 phone call, Barbanel told Kotchen, Low, and three other attorneys that the November 2012 Order required Precision to perform the data processing, that the work was reasonable, and that there was little data processing remaining to be performed. During multiple phone calls in March and April, Avery told Kotchen and Low that there was little data left to be processed.

84.     Precision made these statements intentionally and knowingly, with an intent to mislead, as Precision sought to inflate its invoices and to prevent K&L from taking any action to prevent Precision from incurring its inflated fees.

85.     These fraudulent statements were material to K&L. If K&L had known in advance that Precision intended to process so much data, that Precision's actions were not required by the

November 2012 Order, or if K&L had not been told that the actions were reasonable, K&L would have taken steps to prevent Precision from generating such large invoices.

86. K&L's reliance on Precision's fraudulent representations caused harm. K&L's fees were repeatedly reduced, K&L was forced to engage in ancillary litigation with TDS, the *Baggage Fee Litigation* was delayed and harmed, and other harm was caused.

*Count V: Lanham Act, 15 U.S.C. § 1125*

87. Plaintiff repeats and realleges the allegations in Paragraphs 1 - 86 above.

88. Precision made false and misleading representations to K&L about its services and prices that deceived K&L, including its representations that its prices were discounted, that its services were reasonable and necessary under the court's order, that not much more data needed to be processed, that it would finish its analysis on schedule in May 2013, and that the data it produced to Delta included relevant metadata.

89. Precision's false and misleading representations were material to K&L, as Delta would have been responsible for paying Precision's fees if they had been reasonable or necessary, and K&L would have obtained a benefit from Precision's e-discovery analysis had it been timely and properly completed.

90. Precision sold its services in interstate commerce.

91. K&L has been injured as a result of Precision's false and misleading representations. K&L's fees were repeatedly reduced, K&L was forced to engage in ancillary litigation with TDS, the *Baggage Fee Litigation* was delayed and harmed, and other harm was caused.

25

**Jury Trial Demand**

Pursuant to Fed. R. Civ. P. 38(b), K&L demands a trial by jury of all claims asserted in this Complaint so triable.

**Prayer for Relief**

WHEREFORE, K&L prays that the Court enter judgment against Defendants, and in favor of K&L as follows:

A.      Issuing a declaratory judgment that K&L is not liable for the fees sought by Precision and that Precision's claim against K&L related to e-discovery services is not subject to arbitration;

B.      Award K&L the maximum amount of damages sustained as a result of Defendants' actions, as well as the maximum amount of punitive damages;

C.      Award K&L all costs and expenses of this action, including Attorney's fees; and

D.      Awarding K&L all such relief as the Court deems just and proper.


Dated:  February 10, 2016

/s/ Daniel L. Low
Daniel L. Low, DC Bar #480910
Kotchen & Low LLP
1745 Kalorama Road, NW, Suite 101
Washington, DC 20009
(202) 471-1995 (Tel.)
(202) 280-1128 (Fax)
dlow@kotchen.com

COUNSEL FOR PLAINTIFF KOTCHEN & LOW LLP