IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE DELTA/AIRTRAN BAGGAGE )    CIVIL ACTION FILE
FEE ANTITRUST LITIGATION      )    NUMBER 1:09-md-2089-TCB

## ORDER ON PRECISION DISCOVERY'S AND PLAINTIFFS' COUNSEL'S REQUESTS FOR FEES

This matter is before the Court on the request of Precision Discovery, Inc., Plaintiffs' discovery expert, and Plaintiffs' counsel for payment of their fees and costs incurred in connection with the Court's November 19, 2012 order [375]. Having carefully considered the record and applicable law, the Court will grant in part and deny in part Precision's and Plaintiffs' counsel's requests for the reasons that follow.

## I.    Background

The path of this case to its present place has been long and tortuous. Twice now, Delta has admitted to significant errors in its handling of electronic discovery, which has prevented the forward progress of the case for almost two years. Delta's first admission that it mishandled electronic discovery resulted in the Court issuing an order on February 3, 2012 that,

among other things, reopened discovery and imposed monetary sanctions on Delta.[1]  Its second admission caused the Court to issue an order on November 19, 2012 [375] that directed Plaintiffs' counsel to select a discovery expert, at Delta's expense, to investigate how Delta conducted electronic discovery and to report his findings to the Court.  The Court issued the order with the intent that the expert's investigation and report would finally resolve all outstanding discovery issues.  Evidently, the road to discovery purgatory is paved with good intentions.

On May 20, 2013, the expert issued his report and requested that the Court order Delta to immediately pay all outstanding invoices.  The invoices totaled a staggering $4,899,501.39.  Delta objected to the reasonableness of these fees, and on July 24 the Court held a hearing on the matter.  Also, Plaintiffs' counsel has since informed the Court that they and counsel for Delta have reached an impasse on Delta's paying their fees as directed by the November 19 order.  This Order resolves both disputes.

The Court begins with an evaluation of the November 19 order, and then discusses the expert's work and the role Plaintiffs' counsel, Delta's

---

[1] This order contains a thorough discussion of the discovery issues up to that point.  *See In re Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d 1335 (N.D. Ga. 2012).

counsel and Delta's vendors played in the expert's work. Next the Court evaluates whether the expert's and counsel's fees are reasonable and whether estoppel forecloses Delta's challenges to the fees.

### A.    November 19 Order

As explained in the November 19 order, in September 2012 Plaintiffs informed the Court that they were again concerned that Delta was "continuing to withhold documents about its collection and preservation efforts in hopes that the Court and Plaintiffs will be so exhausted by these discovery issues that the Court and Plaintiffs will give up trying to compel the production of relevant information" (the "September dispute").

In its letters to the Court about the September dispute, Delta vehemently denied (as before) that there were any additional issues with its document preservation, collection and production. However, on October 24, 2012, Delta's counsel informed the Court that Delta had recently learned that approximately forty of its backup tapes had not been turned over to PricewaterhouseCoopers ("PwC") while PwC was assisting Delta with the discovery issue the Court addressed and resolved in the February 2012 order. Delta's counsel proposed that the Court appoint an independent expert to review Delta's files and discovery efforts. On

November 1, Plaintiffs' counsel informed the Court that they objected to the appointment of an expert, and later that day, the Court issued an order that denied Delta's request to appoint an expert.

On November 1, Plaintiffs' counsel also informed the Court about yet another discovery dispute between Plaintiffs and Delta regarding recoverable-deleted items (the "November dispute"). The November dispute arose from Plaintiffs' contention that Delta had a duty to search for recoverable-deleted items, had yet to complete such a search, and refused to complete the search. In briefing this issue for the Court, Plaintiffs asked that their own expert be allowed access to Delta's hard drives, backup tapes and any other electronic data that was reasonably likely to contain responsive recoverable-deleted items.

In the midst of the November dispute, Delta updated the Court on its progress with reviewing the additional backup tapes. Confronted with the September and November disputes, as well as five discovery orders [317, 335, 339, 345, 374] issued since the February 2012 order and related to Delta's electronic discovery, the Court issued the November 19 order, which

directed Plaintiffs to retain a discovery expert. The order instructed the expert to provide a report within thirty days[2] that:

- Identified the sources Delta searched for responsive documents;

- Identified which sources contained responsive documents;

- Described the efforts Delta undertook to preserve responsive documents;

- Indicated whether Delta searched, collected and preserved recoverable-deleted items ("dumpster items"[3]) on those sources;

- Investigated whether there were potential sources of responsive documents that Delta had not searched;

- Provided a list of potentially new sources to Delta and the Court; and

- Determined whether any electronically stored information ("ESI"), likely to contain responsive documents, had been lost or destroyed, and identified that information.

---

[2] The Court later extended this deadline by a total of five months, and the report was provided to the Court on May 20.

[3] Dumpster items are emails that have been deleted twice: once from a custodian's inbox and again from the custodian's deleted items/trash folder. Emails deleted from the trash folder are not permanently deleted immediately. Depending on the settings of the email server, the dumpster items remain on the server another one to two weeks.

This list addressed the dumpster-items issue and the recurring problem of Delta's discovering potential sources of responsive documents after assuring the Court that all potential sources had been searched.  Given the age of the case and breadth of discovery thus far (expanded in part because of Delta's missteps), the scope of the work required by the November 19 order was sizable.  In addition, the majority of the tasks for the expert were adapted from a proposed list of expert tasks included in Delta's October 24, 2012 mea culpa letter [375-2].

And because Delta admitted in the October 24 letter that it had failed to turn over backup tapes to PwC, which had been hired to fix Delta's first admission of discovery errors, the November 19 order provided that Delta would be responsible for paying the fees and costs associated with Plaintiffs' expert.  The order also required Delta to pay all fees and costs incurred by Plaintiffs' counsel as a result of the September and November disputes and the November 19 order.

### B.    Expert's Work and Report

In late November 2012, Plaintiffs identified Precision's Bruce Pixley, a computer-forensics expert, as their discovery expert.  In December 2012, Pixley determined that he might have to involve Precision's electronic

discovery practice, specifically Thomas Avery, given the volume of data at issue and the nature of the problems he had already encountered in processing Delta's data. Interestingly, the January 2013 statement of work prepared by Avery estimated the cost of processing only fifty gigabytes of data for approximately $20,000. Apparently, Pixley planned to start with evaluating five to seven custodians, and Avery's cost estimate reflected this decision. However, Precision's subsequent invoices show that Pixley's plan quickly changed, i.e., expanded, as Precision ultimately processed about 9.5 terabytes (or 9,500 gigabytes) of data.

In February 2013, Precision charged approximately $180,000 for processing almost 461 gigabytes of data, and in March 2013 Precision charged over $765,000 for processing about 1,962 gigabytes of data. This marked increase in data processing from February to March was caused in large part by Delta's vendors, Stratify and eMag. Specifically, Stratify produced requested data to Precision in formats other than what Precision requested and refused to tell Precision how it calculated certain hash values, which are used to electronically label documents. With respect to eMag, Pixley did not trust that eMag had searched dumpster items on the

backup tapes, as it could not provide a log of the searches, and PwC had described eMag as incompetent.

According to Pixley, the issues with Stratify and eMag increased the amount of work tremendously. Pixley created his own database for Delta's data, instead of using Stratify's, and he restored all of the backup tapes and searched them, rather than rely on eMag's work product.[4] Consequently, the scope of Precision's work increased dramatically in March due to Stratify and eMag. Pixley testified that he informed Plaintiffs' counsel of the increasing electronic-discovery costs during their regular phone calls. Yet the record does not contain an updated statement of work reflecting the new expanded scope of the project.

On May 20, 2013, the Court received Precision's report, which totaled 103 pages with seventy-nine exhibits. The first part of the report contains the findings and opinions of Pixley and Precision's computer-forensics practice, and the second half of the report contains the findings and opinions of Avery and Precision's electronic-discovery practice.[5]

_____

[4] As of May 20, Precision had not completed its processing of this information.

[5] This Order does not address the merits of the report as it relates to Delta's document preservation, collection or production. However, the Court does consider the merits of the report to the extent they bear on the reasonableness of Precision's and Plaintiffs' counsel's fees and expenses.

Precision's report informed the Court and Delta that its work was not complete and that Precision intended to submit a "supplemental report." Precision also requested that the Court instruct Delta to immediately pay its fees and costs, although Precision did not identify the requested amount or attach any invoices to the report.

### C.    Delta's Response to the Report

On May 28, 2013, Delta's counsel submitted a letter to the Court claiming that Precision had failed to comply with the Court's order by, among other things, granting itself yet another extension to submit a complete report[6] and by failing to provide, as required by the November 19 order, "a list for Delta's counsel identifying any new sources of documents (recovered or previously unsearched) during the expert's investigation." Delta also claimed that the report contained numerous errors and that Precision was seeking excessive fees, totaling more than three million dollars through April and almost five million dollars by the end of May. Delta requested that the Court order Precision to stop work and hold a hearing to put the case on a path to the end of discovery.

---

[6] As stated above, the Court had previously extended Precision's report deadline five months, and Delta takes issue with the fact that the May 20 report was still not complete.

### D. Pre-Hearing Happenings

On June 3, the Court ordered Precision to cease work and ordered Pixley and Avery to appear at a hearing to offer evidence and argument in support of the reasonableness of their fees and expenses, subject to cross-examination on that issue. On June 6, the Court ordered Precision to submit all invoices related to this case and indicate which ones have been paid (and by whom) and which ones were outstanding.

On June 11, Precision submitted an account statement and its invoices to the Court, which revealed that Precision was seeking $4,899,501.30 in fees and expenses. The charges for data processing, indexing, and hosting totaled $4,080,997.22, including $3,728,895.30 for "All File Native Processing" of more than 9,500 gigabytes (or about 9.5 terabytes) of data at $390 per gigabyte, $255,815.50 in charges for "Conceptual Search Indexing," and $96,286.42 for "Hosting."[7]

On July 22, Delta's counsel informed the Court that Delta intended to offer rebuttal testimony at the hearing from its own forensic and electronic

---

[7] Delta has also challenged the reasonableness of $264,961.45 in charges by Trusted Data Solutions LLC ("TDS"), the backup tape vendor Precision retained. Although TDS's work is a part of Precision's work and even though TDS has not been paid, Precision did not submit TDS's invoices to the Court or offer evidence at the hearing to support the reasonableness of TDS's charges.

discovery expert, Eric Friedberg. Counsel included for the Court's review a summary of Friedberg's testimony. Precision objected to Delta's disclosure of Friedberg mere days before the hearing and to the fact that Friedberg had not prepared an expert report. The Court overruled Precision's objections, informing Precision's counsel that he could thoroughly cross-examine Friedberg.

The Court held a day-long hearing on July 24, 2013. Pixley and Avery testified in support of the reasonableness of Precision's fees and expenses and were cross-examined by Delta. Delta also offered testimony from Friedberg, who testified based on his review of Delta's data and the work of Delta's vendors, Stratify and e-Mag, that Precision's charges were unnecessarily incurred, wasteful and unreasonable.

## II.    Legal Standard

The November 19 order required Delta to pay the cost of Precision's work and Plaintiffs' counsel's fees as a sanction for its latest discovery gaffe. Pursuant to Federal Rule of Civil Procedure 37(b)(2)(A), "[i]f a party. . . fails to obey an order to provide or permit discovery . . . , the court where the action is pending may issue further just orders." Under subsection (b)(2)(C), a court can "order the disobedient party, the attorney advising

Case 1:06-md-02089-TCB Document 394 Filed 09/23/13 Page 12 of 74

that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."

Pursuant to this power, the Court issued the November 19 order and required that Delta pay Precision's and Plaintiffs' counsel's and fees and expenses. The question now before the Court is the extent to which Precision's and Plaintiffs' counsel's requested fees and expenses are reasonable.

## III. Analysis

Evaluating the reasonableness of the fees at issue involves three inquiries:

(1)    Should Plaintiffs' counsel, Precision, or Delta's counsel have sought clarification from the Court as to the scope of work required by the November 19 order?

(2)    Was it reasonable for Precision, with the aid of Plaintiffs' counsel, to perform the work that it did in its efforts to comply with the November 19 order?

(3)    Is Delta estopped from challenging Precision's fees because it waited to raise this issue until after the report was issued?

Answering the last inquiry first, Delta is not estopped from challenging Precision's fees, as it did not have a duty to monitor them during Precision's work. And, as discussed below Plaintiffs' counsel and Precision should have sought clarification of the November 19 order from the Court. They did not, though, and unfortunately the course of work Precision pursued was not reasonable. However, Precision was, in part, forced to the project crossroads because of Delta's vendors, Stratify and eMag. Thus, there is fault on both sides with respect to this project, and the Court finds that a fifty-percent reduction of Precision's and Plaintiffs' counsel's fees adequately distributes the fault.

### A.   The Tipping Point

Review of the record shows that the scope of Precision's work ballooned in March 2013. Of the almost five million dollars billed by Precision, over $3.7 million arises from Precision's electronic-discovery practice processing data, and the majority of the data-processing fees was billed in March, April and May, with the April invoice generated less than three weeks before the report was issued.

In early March, most of the data remain unprocessed, and at this point Precision or Plaintiffs' counsel should have come to the Court and

explained what Precision had now determined was necessary in order to comply with the November 19 order. Indeed, Plaintiffs' failure to bring this issue to the Court's attention, despite their previous willingness to inform the Court of discovery issues, particularly issues allegedly caused by Delta, suggests that they were not unwilling to exploit the November 19 order.[8]

This is further supported by the fact that Plaintiffs' counsel presented two issues to the Court in March 2013 related to Precision's work: the first addressed Plaintiffs' request to extend Precision's report deadline, and the second addressed whether TDS was subject to the confidentiality order. The first issue suggests that Plaintiffs' counsel had discussed with Pixley why such an extension was necessary—largely due to Stratify's lack of cooperation—and the second that counsel had discussed why TDS had to be hired—because eMag could not be trusted. Thus, the nature of these issues suggests that Plaintiffs' counsel knew what was going on; yet they remained silent as to the expanded scope of Precision's work.

---

[8] For example, in a February 5, 2013 letter to the Court [376-1], Plaintiffs insisted that Delta send to them all non-privileged documents relevant to Delta's discovery conduct that Delta also provided to Pixley. Plaintiffs contended that in order for them to be "zealous advocates" they had to have access these documents. The Court disagreed with and overruled Plaintiffs' position [376].

Beyond the above observations, the onus of informing the Court of the expanded scope of the project did not fall on Delta for several other reasons. First, Precision was Plaintiffs' expert, and Plaintiffs' counsel were responsible for managing its work; nothing in the November 19 order indicates that the Court wanted Precision to comply with the order without regard for costs. Both Precision and Plaintiffs' counsel are experienced with complex litigation and should have sought instruction on how to proceed once Precision determined that its scope of work greatly expanded when it concluded that it had to reprocess all of Delta's data.

Second, Plaintiffs' counsel received Avery's statement of work, which included Precision's cost sheets, and the record does not show that this document was shared with Delta's counsel. Thus, Plaintiffs' counsel, and obviously Precision, knew the cost of processing the terabytes of data Precision requested from Delta. So again they were in the best position to seek clarification of the scope of work required by the November 19 order.

Third, Plaintiffs' counsel largely made Delta communicate with Precision and vice-versa through them, repeatedly expressing their concern that if Delta had direct contact with Precision it would change the course and scope of Precision's work, presumably in Delta's favor. Also, at the

hearing Pixley testified that it was his investigation, and he took this to mean he made the decisions. Thus, it was unreasonable for Plaintiffs' counsel to expect Delta to keep Precision in check when Delta did not have all of the information.

Furthermore, in February 2013 the Court issued an order related to Precision's work in which Delta was reminded that "it must produce, without concern for responsiveness, relevance, privilege, etc., whatever Pixley requests in connection with his fulfillment of the directives in the November 19 order."  The language was included, in part, because of concerns raised by Plaintiffs' counsel in their February 5, 2013 letter. Obviously Delta had some idea of how much data it produced in complying with this language and Pixley's request.  But again, Delta did not have context for Precision's work since it was largely prevented from asking Pixley substantive questions; consequently, Delta could not know that Pixley intended to reprocess not only the original data but also four to five times that amount.

Finally, the emails between counsel for both parties show that Plaintiffs' counsel constantly held the threat of additional motion practice

over Delta's head, which would give Delta minimal incentive to question Precision's work, lest those questions be construed as a lack of cooperation.

Thus, Plaintiffs' counsel and Precision should have sought clarification from the Court in March 2013 as to whether the November 19 order contemplated Precision's reprocessing 9.5 terabytes of data at a cost of almost four million dollars. Because the Court determines below that there were less expensive and time-consuming ways to process the data, their failure to come to the Court shifts part of the burden for paying Precision's fees away from Delta.

### B. Precision's Data-Processing Charges

The vast majority of Precision's fees arise from data processing, indexing and hosting. Over $3.7 million (more than 76 percent of Precision's total fees) relate to line items in the February, March, April and May invoices labeled "All File Native Processing." The invoices and testimony indicate that over 9.5 terabytes of data were processed at $390 per gigabyte.[9] Delta focuses its challenge on whether the data processing conducted by Precision at that rate was at all necessary or reasonable.[10]

---

[9] Precision showed at the hearing that the 9.5 terabytes of data consisted of at least 66 million files. Avery testified that he did not know how many of the 66 million

### 1. Deduplication and Stratify

#### a. Precision's Argument

Precision's main argument in support of its data-processing charges is that it needed to be able to deduplicate documents from any sources it found against the documents that were already collected, reviewed and produced. Precision claims that it could not deduplicate any new documents against the existing database maintained by Stratify because Stratify's process was unreliable; Stratify did not give data to Precision in the requested form; and Stratify did not process all data sources, i.e., it did not have complete data sets.

Precision reached its conclusions as to Stratify's data and work based on Stratify's admission that it had not processed at least three CDs and Precision's own investigation revealing that all data sources had not been sent to Stratify. In addition, Precision was unable to (1) replicate Stratify's

---

files were new, but that there were "several documents that were discovered in the data source comparison analysis that were outside of the data in the Stratify data set."

[10] Delta also challenges the reasonableness of $255,815.50 for "Conceptual Search Indexing" and $96,286.42 for "Hosting." Because those charges were incurred only as a result of Precision's decision to spend $4 million to create its own document database, Delta contends these charges should be disallowed. Although the Court does not address these fees specifically, the reduction in Precision's fees adequately addresses Delta's concerns.

MD5 hash values[11] due to Stratify's unwillingness to share how it calculated those values, and (2) match Stratify's MD5 hash values across Stratify's datasets, which Precision interpreted to mean that Stratify's process altered the data that passed through it.

At the hearing, Pixley testified that the re-processing of approximately 9.5 terabytes of data was also justified because he found that some data was lost or destroyed prior to being processed by Stratify.  Pixley also claimed that Precision needed to process the data so that he could be confident the work was completed correctly.[12]

### b.    Friedberg's Rebuttal Testimony

Friedberg testified that Precision had no reason to question the integrity of Stratify's data-processing system.  According to him, Precision should never have expected to be able to replicate Stratify's proprietary hash values, and consequently its inability to do so cast no doubt on the integrity of the Stratify system.

---

[11] An MD5 hash value is a unique document identifier generated by a mathematical algorithm.  While the MD5 hash value for non-email electronic documents is relatively if not completely standardized across e-discovery vendors, generating an MD5 hash value for emails is more complex and customized and, as a result, harder to replicate across vendors or data processing engines.

[12] As discussed below, there were errors in Precision's work.

Friedberg also rejected Precision's claim that it could not line up the hash values employed by Stratify as documents moved from one dataset to another. Friedberg testified that he compared the Stratify hosted and production data sets and found a one-hundred-percent match in the hash values; he also testified that he compared the staged and hosted data sets and again found a one-hundred-percent match of the hash values. This led Friedberg to conclude that Precision improperly loaded the data,[13] which is why it found mismatches.

Friedberg also testified that even if there were a valid reason for Precision to question Stratify's system, there were more cost-effective ways to check the integrity of and to deduplicate documents in Stratify's data sets. Friedberg contends that Precision should have tested the integrity of Stratify's data sets by having Stratify process a sample of documents multiple times to confirm that the same documents (including the same hash values) emerged from the process each time.

And for deduplication, Friedberg argued that Precision should have used key metadata fields, such as sender, recipients, subject line and sent time to the minute, to compare documents and remove the duplicates.

---

[13] As stated previously, Stratify failed to give Precision the data in the requested format, which could have caused the loading problems.

Friedberg testified that he has used this process himself to deduplicate at a fraction of the cost of Precision's approach of starting from scratch. (Avery also testified that this deduplication method is "pretty standard" for email.)

Friedberg did identify one limitation with his proposed method: emails could have the same metadata but different body text, and his method would not identify them as different documents. However, this would require that the email be sent by the same person to the same people with the same subject within the same minute. Friedberg testified that this method of deduplication would have cost approximately one-tenth of Precision's total because Stratify would deduplicate for Delta at no charge.

Finally, Friedberg testified that the discovery of unprocessed data sources did not justify Precision's decision to build its own data set either. Instead, he testified, Precision should have stood over Stratify's shoulder and had it process these new sources.

### 2. Backup Tapes

#### a. Precision's Argument

One of the tasks the November 19 order required was for Pixley to determine whether Delta had searched its backup tapes for dumpster items. Consequently, Precision requested that Delta deliver server backup tapes

and extracted tape data. This required Delta to contact its tape vendor, eMag, which had processed the backup tapes and extracted data therefrom for the relevant custodians.

eMag informed Pixley that it had searched for dumpster items, but it did not have a log of this search. Upon receipt of the data, Precision had TDS restore every backup tape and extract all of the data. When asked by Delta why he did not do an audit to check a few tapes, Pixley responded that "that was initially what [he] tried to do in January." However, according to Pixley, by the time he received the tapes and data from Delta, he "didn't have a lot of time," so he "would not be able to go back multiple times and not going to be able to drag this out." Therefore, he had TDS redo eMag's work.

TDS extracted over 15,000 .pst files[14] from more than 1,500 restored EDB files[15] on these tapes. This extraction collected multiple terabytes of data. Much of that data was then re-processed by Precision, which Pixley testified contributed considerably to Precision's data-processing charges because there was a "significant amount of e-mail on each of those backup

---

[14] A .pst file is a personal storage folder file in Microsoft Outlook.

[15] EDB files are exchange database files that act as a pointer to a user's Microsoft Outlook profile. The files are essentially a repository of sent and received emails and any information related to these emails.

tapes." The report sheds more light on why Precision decided to redo eMag's work.

According to the report, Pixley requested extracted tape data from Delta in early January 2013 because he wanted to conduct a "preliminary investigation to validate eMag's work product." As time passed without Precision's receiving the requested data, Pixley was concerned that he would not meet the Court's deadline. The approaching deadline, coupled with other alleged discovery deficiencies Pixley had identified, made him decide that the backup tapes should be reprocessed by TDS. Plaintiffs' counsel were aware that he made this decision. Delta gave Precision the requested data and tapes in mid-March.

Pixley testified that he had TDS extract dumpster items for the relevant custodians because he had concerns about whether eMag had in fact processed the dumpster items. As stated previously, eMag assured Pixley that it had processed the dumpster items, but that it did not have a log of these items.[16] The lack of a log, combined with emails between PwC

---

[16] At the hearing, Delta questioned Precision about the work it had TDS perform, and based on the testimony it elicited, Delta contends that TDS's fees, which total $264,961.45, are unreasonable. However, an invoice of TDS's fees was not provided to the Court prior to the hearing, and Precision did not indicate in its report or at the hearing that its request for payment extended to TDS. Consequently, the Court will not

employees, who characterized eMag as "incompetent and douche central," made Pixley doubt eMag's representations as to the dumpster items. As of the hearing, Precision had not completed analysis of the data extracted by TDS and thus could not offer an opinion as to whether Pixley's concerns about eMag were valid. Precision's inability to complete the work by the deadline makes the Court skeptical of Pixley's explanation that TDS had to restore all of the backup tapes because he was running short on time.

Precision also had TDS extract additional mailboxes and dumpster items for other Delta employees, even if they were not identified as custodians. Pixley claims that this was necessary in order to comply with the November 19 instruction that the discovery expert determine if there were sources that Delta failed to preserve and search. Precision talked with Plaintiffs' counsel about its decision to do this.

As Avery testified, Precision attempted to identify additional "custodians relevant to this matter" by running search terms against backup-tape mailboxes of random Delta employees. Specifically, Precision searched the November 20, 2008 backup tape, which contained an additional 191 custodians whose data had not been collected. Avery's team

---

address the reasonableness of TDS's fees. Nonetheless, this Order should give the parties guidance on how the Court would rule if presented with the issue.

searched these custodians' mailboxes and dumpster items to see if new sources of data could be identified. According to the report, Avery's team identified 120 additional custodians based on data hits. However, as Pixley testified, Precision used incredibly broad search terms, such as "bag w/5 fee." Given that each Delta employee received emails announcing the first-bag-fee implementation, the Court questions whether these types of searches justified the expanded scope of Precision's work with respect to these backup tapes.

### b. Friedberg's Rebuttal Testimony

Friedberg testified that Precision did not have to reprocess all of the backup tapes and restore dumpster items to custodians' mailboxes. He contends that even if Precision had valid doubts as to eMag's work and whether it had restored dumpster items, Precision should have tested a sample of mailboxes to see whether the dumpster items had been processed. According to Friedberg, this would have cost a small fraction of the amount Precision actually charged.

Friedberg testified that he was able to quickly verify that eMag had properly processed dumpster items from the tapes using a small sample of custodians. He also testified that he was not sure how many sample

custodians should have been used to verify that eMag properly extracted dumpster items, but he was confident that it was not the number that Precision searched.

### C.    Reasonableness of Precision's Data-Processing Method

The Court finds that Precision and Plaintiffs' counsel should have informed the Court about Precision's concerns with Stratify and eMag, at the latest, in March 2013 when the difficulties caused by these vendors led Precision to believe it had to build its own database and restore every backup tape.

By March, Precision questioned the integrity of Stratify's data, its failure to process or receive all data sources, and the format in which it provided data to Precision.  Precision also questioned whether eMag had restored custodians' dumpster items.  These questions caused Precision to radically change how it approached the tasks in the November 19 order; consequently, Precision and Plaintiffs' counsel should have contacted the Court.  However, Delta is not completely blameless; its vendors are the ones who caused the expansion of Precision's work.

Looking at how Precision chose to proceed, the Court is skeptical that the only way Pixley could be "confident" that Stratify's and eMag's work

was done correctly was for Precision to redo it all. And not just redo it but expand it; Avery testified that his "electronic discovery practice went through about four to five times what was originally collected in the Delta process."

Friedberg's testimony plausibly suggests that there were more efficient, less expensive ways to comply with the November 19 order. Indeed, in a November 27, 2012 email to Plaintiffs' counsel, Delta also suggested that if Pixley intended to redo the work PwC had eMag perform, PwC and eMag may be able to complete "whatever additional work Mr. Pixley needs more quickly and efficiently since they are familiar with the data." Delta also pointed out that it seemed to be "a waste of time and money for [Precision] to copy [the backup tapes] and run forensics on tapes that postdate the operative events of the case by years." Thus, from the beginning Plaintiffs' counsel has been aware of Delta's position and its willingness to have its vendors assist with Precision's work.

And from the outset, Plaintiffs' counsel shut down any cooperation. In a November 28 email to Delta's counsel, Plaintiffs' counsel made their position quite clear: "Delta's counsel does not have the right to decide how Mr. Pixley should stage his work or to preapprove his purposes for

interviews."  At this point, Plaintiffs' counsel assumed responsibility for Precision's decisions and cannot foist the consequences of those decisions on Delta.

The Court is mindful that Precision was hired to finally dispel the black cloud surrounding Delta's discovery production, and thus Pixley felt he had to be thorough, and Plaintiffs' counsel felt that they had to limit Delta's involvement.  There is evidence that suggests that Stratify did not fully cooperate with Precision and committed mistakes during its initial processing of Delta's data.[17]  Precision also had reason to doubt the competency of eMag's work based on comments made by PwC employees.

Yet evidence at the hearing revealed that Precision's work and results were flawed, too.  For example, its database contains thousands of irrelevant picture files, tens of thousands of documents outside the relevant date range for this case, and over 100,000 documents responsive to search terms the parties previously agreed to drop.  Also, neither Pixley nor Avery could meaningfully explain the contents of the database Precision compiled for Delta's review.  Pixley testified that Avery was the person with

---

[17] Although Precision complained at the hearing about the format in which it received the information from Stratify, it never raised an issue with Stratify, and it represented to Delta on March 28, 2013, that the "specs" suggested by Stratify were "fine."

knowledge of the database, but Avery lacked knowledge of significant aspects of the database, including the file types in the database and the search terms utilized for its creation.  Avery also admitted that some of the work that created the database was unproductive.

Even worse, Pixley could not provide basic information—much less testify with confidence—about Precision's data processing and whether it was done correctly.  And the evidence shows that it was not done correctly, as Avery testified that the tagging analysis,[18] the cost of which is rolled into the $390-per-gigabyte fee, in the report is wrong.

In addition, Plaintiffs' counsel repeatedly complicated the process through their involvement, thereby unnecessarily and unreasonably increasing their fees and Precision's.  As early as November 27, 2012, Delta expressed frustration to Plaintiffs' counsel arising from their repeated refusals to allow Delta to talk with Pixley about his work and their intent to "always serve as an intermediary between Delta and Mr. Pixley."

It is true that Precision is Plaintiffs' expert; however, counsel's "protectiveness" of Precision's work made communication between

---

[18]  The report asserted that only 19 percent of the documents on Delta's review site had been tagged.  According to Friedberg, Delta's counsel had tagged more than 90 percent of the documents on its review site.

Precision, Plaintiffs' counsel and Delta's counsel difficult, stilted and time-consuming. Plaintiffs' counsel contend that they allowed Delta access to Pixley, and that they proposed regular calls between Pixley and Delta. However, in a March 6 email, Plaintiffs informed Delta that they were "unaware of any situation in which a party's counsel held weekly calls with the opposing party's expert to ensure that the opposing party's expert 'stay[ed] on target.'" (Alteration in original).

Rather, Plaintiffs' counsel offered to allow Delta's IT staff and vendors to have regular calls with Pixley "regarding the status of outstanding data requests." Plaintiffs' offer did not amount to an offer for transparency; it excluded Delta's counsel and limited the topic of the calls to outstanding data requests. Given this case's tortured history, excluding Delta's counsel from these conversations helped no one, especially the Court and its goal to finally move this case forward. And Plaintiffs' counsel's foreclosure of any discussion regarding the scope of Precision's work because of their alleged concern "about Delta's efforts to dissuade Mr. Pixley from seeking documents and interviews . . . and about Delta's efforts to improperly alter the direction of his investigation" further prevented this project's achieving the transparency and resolution the November 19 order anticipated.

Thus, the Court concludes that at a minimum, before proceeding to redo years' worth of ESI discovery, Precision and Plaintiffs' counsel should have sought the Court's guidance since Plaintiffs' counsel clearly did not want to work with Delta. The testimony from Pixley, Avery and Friedberg and the results obtained by Precision show that neither approach—rebuilding the database from scratch or having Stratify and eMag run samples and new sources—was flawless. Thus, the less expensive method appears preferable, making Precision's and Plaintiffs' counsel's requested fees unreasonable.

### D.    Plaintiffs' Estoppel Theory

Plaintiffs' counsel argued at the hearing that Delta should have raised any objections it had about Precision's processing charges before the report was submitted. They contend that because Delta failed to do this, it is estopped from challenging the reasonableness of those fees. The Court disagrees.

As stated above, Plaintiffs' counsel exercised continuous oversight of Precision's work and were in the best position to impose some restraint on Precision, as Pixley and Avery testified that they regularly consulted with Plaintiffs' counsel about the progress and scope of their work. Indeed,

Pixley testified that he consulted with Plaintiffs' lead counsel about whether to inform the Court of the substantial data-processing charges being incurred. According to Pixley's testimony, Plaintiffs' counsel decided not to raise the issue with the Court, and Precision did not object.

Emails submitted by the parties[19] show that the issue of fees arose in early March 2013. On March 1, Delta asked for a preliminary statement of Precision's fees and costs through February 2013, stating that it should have this information since it had accommodated Plaintiffs' counsel's requests to extend Precision's deadline. Delta also asked for Plaintiffs' counsel's fees and costs. On March 6, Plaintiffs' counsel responded that they would "be happy" to provide detailed invoices as long as Delta agreed to the following provisions:

> documentation provided by Plaintiffs will be used only for purposes of the fee request; there is no privilege waiver based on the disclosure of information in connection with the fee request; Delta will promptly pay the undisputed amount of the fees and expenses owed; and for any disputed amounts in the preliminary fee statement, Delta agrees that Plaintiffs will be entitled to file a fee motion with the Court now (or at their discretion, Plaintiffs will be entitled to delay their motion to combine with a future fee request).

---

[19] Exhibit 1 to this Order is a chronology of the relevant emails, with the actual emails attached.

So, Plaintiffs did not provide the requested data.  On March 18, Plaintiffs' counsel sent another email, in which they stated that their fees for July 2012 through February 2013 totaled $1,985,035.78, of which $655,634.83 were payments to Precision.  Counsel again reiterated their demands for disclosing the actual invoices.  Thus, March 18 is the first time Delta had any idea as to the cost of Precision's work.

The fact that the issue of fees did not arise until almost four months into Precision's work gives the Court pause.  There is no evidence in the record that Delta had previously asked about Precision's fees or that Delta had previously asked for invoices.  However, there is also no evidence that Plaintiffs' counsel had previously raised the issue with Delta either (even after they paid Precision over $650,000), and Plaintiffs have not shown that Delta had a duty to inquire sooner than it did.  Moreover, the parties' emails show that Plaintiffs' counsel repeatedly accused Delta of trying to interfere with Precision's investigation, threatened to file motions at every turn, and kept Delta uninformed as to the scope and cost of Precision's work.  Thus, there is no basis for Plaintiffs' argument that Delta should have taken steps to object to Precision's fees sooner than it did.

In addition, the Court finds that Delta has an adequate explanation for waiting.  The tone of the parties' emails shows that Plaintiffs' counsel responded hostilely to any questioning by Delta of Precision's work and refusing any offer by Delta to streamline Pixley's work, which suggests that any challenge to the cost of Precision's work by Delta would have been met with similar hostility and futility.  Indeed, the March 6 and 18 emails from Plaintiffs' counsel reveal that fee discussions would be complicated and time-consuming.  Delta's March 29 email in response to Plaintiffs' email about the fees explains why Delta did not want to have to pay or dispute the invoices immediately.

In that email, Delta explained to Plaintiffs that it and Precision needed to focus on the substantive work required by the November 19 order, and that addressing Plaintiffs' counsel's fees and Precision's invoices on an interim basis would bog down the process.  Nonetheless, Delta informed Plaintiffs that it would look at the invoices if Plaintiffs sent them, even though Delta did not believe that the November 19 order contemplated its making interim fee payments for Precision's or Plaintiffs'

counsel's work.[20]  Thus, contrary to Plaintiffs' assertion, Delta did not have a duty to raise this issue earlier, and Delta did not adamantly refuse to address fees until after the report was issued.

Even if Delta had some duty to inquire earlier about Precision's invoices, Delta asked about fees before Precision incurred 75 percent of the total fees it now seeks.   The emails demonstrate that Delta had no knowledge of Precision's requested fees until March 18, 2013, when Plaintiffs told Delta for the first time that Pixley's fees amounted to approximately $650,000 for work done from November 2012 through February 2013—a fraction of the almost five million dollars in fees Precision now seeks to recover.   Even then, Delta did not know what Precision was charging for data processing, as Plaintiffs did not include the invoices, or that Precision had decided to reprocess all of Delta's data.

Delta learned about the $390-per-gigabyte data-processing fee on April 12 when it first received Precision's actual invoices for November 2012 through March 2013.   By then, the March line item for data-

---

[20] Part of Delta's concern with paying the invoices as received was that it would become embroiled in arguments over and motion briefing for each invoice while also trying to comply with Precision's requests.   Delta stated that its fear was based on Plaintiffs' counsel's previous behavior when the parties were trying to resolve fees. Indeed, as Plaintiffs' counsel's March 6, 2013 email shows, they included with their request for payment of their fees numerous demands, which have been provided above.

processing alone, $772,291.35, exceeded the cost for all of Precision's work from November 2012 through February 2013.  And even though the March bill included a significant increase in the data-processing line item, the March total for data-processing pales in comparison to Precision's final total for processing Delta's data: $4,102,020.07.

Also, there is no evidence that Plaintiffs' counsel or Precision ever explained to Delta, prior to its review of Precision's report, that Precision was essentially reprocessing all of Delta's ESI.  Thus, Delta had no reason to expect Precision's fees would increase by a factor of seven between March and the end of May.

Upon receiving the invoices on April 12, Delta advised Plaintiffs that it was reviewing the invoices.  On May 6, Delta sent Plaintiffs an email specifically questioning the data-processing fees, which were opaquely labeled "All File Native Processing (Single Tier)" on the invoices.  Plaintiffs' counsel did not respond until May 19—the day before the submission of Precision's report—when they also sent the April invoice, which sought a staggering $1.8 million for data processing for that month.  Soon thereafter, Delta informed the Court that it believed Precision's fees were unreasonably high.  Thus, even if Delta did have a duty to immediately

inquire as to Precision's fees, its failure to do so did not prejudice Plaintiffs or Precision, as Delta had inquired about fees before Precision amassed almost three-quarters of its data-processing fees.

Thus, the Court finds Plaintiffs' estoppel argument unavailing.

## IV.   Decision on Precision's and Plaintiffs' Counsel's Request for Fees

Delta is not estopped from challenging Precisions' fees, and it rightfully challenged the reasonableness of both Precision's and Plaintiffs' counsel's fees.   Precision and Plaintiffs' counsel should have sought clarification from the Court as to the scope of work required by the November 19 order.   They did not, but instead chose a course of action without the Court's or Delta's input.   Precision chose a course that was expensive, time-consuming, and produced inconclusive results.[21]

However, Precision was forced to this crossroads as a result of problems created by Delta's vendors, Stratify and eMag.   The Court is also mindful of the fact that Precision is involved in this case because of Delta's second admission that it yet again mishandled electronic discovery.   After careful consideration, the Court finds that the fault is justly divided evenly.

---

[21] As of right now, the Court has no idea what is in the data set Precision gave to Delta, so it is not even clear whether Precision's thorough but flawed work was worth the time and money it cost.

Accordingly, the Court will reduce Precision's and Plaintiffs' counsel's requested fees by 50 percent as detailed below.

The Court GRANTS IN PART and DENIES IN PART Precision's request for payment of its fees and costs incurred in connection with the Court's November 19, 2012 order.  Precision seeks $4,899,501.39 in fees, and Delta is required to pay $2,449,750.70, which reflects a fifty-percent reduction.  The Court finds that this sum represents the reasonable value of the services provided to date by Precision in this case.  Of the reduced amount, Delta shall first pay $655,634.83 to Plaintiffs' counsel, Richardson, Patrick, Westbrook & Brickman, LLC, who remitted payment in this amount to Precision.[22]  Delta shall pay the remaining $1,794,115.87 to Precision, and Delta shall remit both payments within fourteen days of this Order.

Also, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' counsel's request for reimbursable fees incurred in connection with the September dispute, the November dispute and the November 19 order.  As of February 28, 2013, Plaintiffs' counsel's reimbursable fees and expenses

---

[22] This amount reflects payment of Precision's computer-forensics invoices dated November 30, 2012, December 31, 2012, January 31, 2013 and February 28, 2013, and Precision's electronic-discovery invoice dated February 28.

totaled $1,335,398.   The Court finds that their total reimbursable fees incurred in connection with the November 19 order should be reduced by one-half; however, Plaintiffs are entitled to the full of amount of their fees incurred as a result of the September and November disputes.   Within fourteen days of this Order, Delta shall remit payment to Plaintiffs' counsel.

And, as stated previously, the Court does not issue a ruling on the $264,961.45 in charges incurred by TDS.

## V.   Going Forward

Precision's report states that it has not processed all of the data extracted from the backup tapes, including potential new custodians Avery's team identified.  Precision represented at the hearing that it would take sixty days to process this data and present documents to Delta for its review.

The Court has contemplated having Precision complete its work. However, after careful consideration, the Court has determined that it will not have Precision complete the work.  Of the documents identified as "responsive" and included with Precision's report that the Court has reviewed, none appears to be evidence of a conspiracy between Delta and AirTran or evidence that Delta spoliated other relevant evidence.   And

Case 1:16-mc-00224-GK Document 182 Filed 04/05/16 Page 40 of 74
Case 1:09-md-02089-TCB Document 394 Filed 09/25/13 Page 40 of 74

rather than resolve outstanding issues with Delta's handling of electronic discovery, Precision has muddied the waters even more with its own actions.

Thus, the Court finds that having Precision complete its work is not in the best interest of this case. Nevertheless, Precision shall continue to maintain in strict confidence all documents and tangible things in its possession, custody or control related to this case. It shall not disclose or discuss any of the materials it has received from Delta, or its analysis thereof, except at the request of Delta.

The case schedule going forward is as follows:

- Within thirty days of this Order, Delta's counsel shall review the records provided to them by Precision for privilege and responsiveness, appropriately supplement Delta's responses to Plaintiffs' discovery requests, and produce to Plaintiffs' counsel all responsive and non-privileged documents and tangible things, in addition to a privilege log that identifies each privilege and describes "the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or

protected, will enable other parties to assess the applicability of the privilege or protection." FED. R. CIV. P. 26(b)(5)(A).

• Within thirty days of this Order, Delta's counsel shall also provide to Plaintiffs' counsel a copy of Precision's report with privileged information, if any, redacted.

• Within thirty days of this Order, Defendants shall file their briefs in opposition to Plaintiffs' supplemental class-certification brief.

• Within thirty days of receiving Precision's report and Delta's supplemental responses and documents (if any), Plaintiffs shall file a motion for sanctions related to Delta's second discovery mistake if they determine such a motion is appropriate in light of the record. Plaintiffs shall provide with their motion documents or tangible things that support their conspiracy claim or their contention that Delta has lost or destroyed relevant evidence. Plaintiffs' brief in support of their motion for sanctions is limited to thirty pages. Within the time and page limits prescribed by the Local Rules, Delta shall file a brief in opposition to any such motion and Plaintiffs, a reply brief.

If Plaintiffs do not file a motion for sanctions, then:

- Within thirty days of receiving Precision's report and Delta's documents, Plaintiffs shall file their consolidated brief in opposition to Defendants' motions for summary judgment, not to exceed seventy-five pages.

- Within twenty-one days of Plaintiffs' opposition brief being filed, Defendants shall file their reply briefs, not to exceed thirty-five pages.

- Within fourteen days of the reply briefs being filed, Plaintiffs may file, if they choose to, a thirty-five-page surreply brief.

- Within fourteen days of the surreply brief, if one is filed, AirTran may file a sur-surreply brief, not to exceed fifteen pages.

If Plaintiffs file a motion for sanctions, the Court will issue a revised case schedule with its order on that motion.

IT IS SO ORDERED this 25th day of September, 2013.

Timothy C. Batten, Sr.
United States District Judge

## Exhibit 1

## Chronology of Emails regarding Precision Discovery's Fees

| Date | Event |
|---|---|
| Nov. 2012 – Feb. 2013 | Precision generated monthly invoices. Plaintiffs' lead counsel apparently paid these invoices, but did not provide them to Delta. |
| Feb. 19, 2013 | Delta raised questions with Plaintiffs' counsel about Precision's request for copies of the hard drives of numerous Delta employees who were not custodians in the case and had nothing to do with Delta's 2008 decision to adopt a first bag fee. (**Exhibit 1.1 (p.2)**, 2/9/2013 Email, R. Allen to D. Low ("*Since these custodians are not related to Delta's first-bag-fee decision, we do not understand why we are being asked to collect these additional hard drives and other data.*)).<br><br>• Plaintiffs' lead counsel ignored Delta's questions and told Delta to collect the data requested by Mr. Pixley pursuant to the Court's prior Orders. (**Exhibit 1.1 (p. 2)**, 2/9/2013 Email, D. Low to R. Allen ("*Consistent with the Court's orders (including its 2/5/13 Order), please collect the hard drives and data Mr. Pixley has requested.*")).<br><br>• Delta reiterated its concerns about the reasonableness and relevance of the exercise, and requested a call with Mr. Pixley to discuss the request. (**Exhibit 1.1 (pp. 1-2)**, 1/20/2013 Email, R. Allen to D. Low ("*I again invite you to arrange a call with Mr. Pixley to clarify these issues. ... I think it is in everyone's interest to get him the information he needs and not to cover him up with information he does not need or want or for us to waste time collecting information that is not directed to Mr. Pixley's charge as described in Judge Batten's November 19 Order.*")).<br><br>• Plaintiffs refused Delta's requests for a call, and ignored Delta's concerns about the reasonableness of the data request. (**Exhibit 1.1 (p. 1)**, 2/25/2013 Email, D. Low to R. Allen ("*in light of the clear directives of the February 5 Order that 'Delta . . . must produce, without concern for responsiveness, relevance, privilege, etc., whatever Mr. Pixley requests in connection with his fulfillment of the directives in the November 19 order,' there is no basis for Delta's current demand to question Mr. Pixley about the relevance of documents that he has requested in connection with his assignment.*")). |
| Mar. 18, 2013 | In response to Delta's March 1 request, Plaintiffs' counsel disclosed for the first time that Precision had incurred $655,634.83 through February. (**Exhibit 1.2 (p. 7)**, 3/18/2013 Email, D. Low to R. Allen). However, Plaintiffs' counsel provided no invoices or supporting documentation. |

| Date | Event |
|---|---|
| | Also on March 18, Delta raised questions about Mr. Pixley's work with backup tapes, including his request for mid-2009 backup tapes that had never been at issue in the case.  (**Exhibit 1.3 (p. 2)**, 3/18/2013 Email, R. Allen to B. Pixley (*"[A] number of the tapes you asked for copies of in your email this weekend were not (based on my reading) previously requested.  More specifically, six of the tapes in your March 17 request were never restored, and no mailboxes were extracted from them (Tapes 196-198, 200-202). As such, yesterday's request appears to expand the scope of any prior request."*).  |
| | Plaintiffs' counsel told Delta to stop interfering with Mr. Pixley's work, and accused Delta of misrepresenting to the Court that it was cooperating with Mr. Pixley's investigation.   (**Exhibit 1.3 (p. 1)**, 3/18/2013 Email, D. Low to R. Allen (*"Plaintiffs are disturbed by the suggestion in your e-mail that you may not provide Mr. Pixley with access to the data he has requested on Wednesday, especially after Delta represented to the Court that it was cooperating with Mr. Pixley and was not refusing to respond to this (or any other) request."*)). |
| Apr. 12, 2013 | On April 12, a little over a month before the May 20 report deadline, Plaintiffs' counsel provided Delta with Precision's invoices to back up the amount disclosed in the March 18 email.  (**Exhibit 1.2 (p. 5)**, 4/12/2013 Email, D. Low to R. Allen).  Plaintiffs' counsel also provided Delta with Precision's March 2012 invoices, reflecting $924,131.13 in fees.  The February and March invoices contained the first separate charges for "all file native processing" charges, totaling $944,981.70 for those two months. |
| Apr. 24, 2013<br><br>May 6, 2013 | On April 24, Delta told Plaintiffs' counsel that it was reviewing Precision's invoices, and on May 6 emailed Plaintiffs' counsel a list of questions about them, including questions about the almost $1 million in "all file native processing" charges.  (**Exhibit 1.2 (pp. 2-5)**, 4/24 & 5/6/2013 Emails, R. Allen to D. Low). |
| May 19, 2013 | The day before the report was due, Plaintiffs' counsel responded to Delta and also provided Precision's April invoices, which totaled $1,947,911.41 – over 90% ($1,837,430.40) of which consisted of additional "all file native processing" charges.  (**Exhibit 1.2 (pp. 1-2)**, 5/19/2013 Email, D. Low to R. Allen). |
| May 20, 2013 | Precision submitted its incomplete Report, which demanded payment of all of its fees and expenses, and informed the Court and Delta that it planned to continue to process additional data.  (Report at 75, 89, 96). |
| June 11, 2013 | On May 28, Delta wrote the Court expressing concerns about Precision's work and its excessive fees.  Delta did not learn until June 11, the day *after* Precision submitted all of its invoices to the Court, that Precision |

| Date | Event |
|------|-------|
|  | incurred another $1.3 million in fees in the first twenty days of May. (**Exhibit 1.4 (p. 1)**, 6/11/2013 Email, B. Pixley to R. Allen (attaching May invoices)). This included more than $1.2 million in additional charges for data processing, hosting, and "conceptual search indexing." |

3

**Exhibit 1.1**

## Michael Mitchell

| | |
|---|---|
| **From:** | Daniel Low [dlow@kotchen.com] |
| **Sent:** | Monday, February 25, 2013 7:51 PM |
| **To:** | 'Allen, Randall' |
| **Cc:** | 'Rutherford, Sam'; Michael Mitchell; 'Daniel Kotchen' |
| **Subject:** | RE: Collection and Preservation Request |
| **Attachments:** | Follow-up to requests of hard drive images and network-stored data |

Randall,

In an effort to accommodate Delta's demands, we have asked Mr. Pixley to respond to your e-mail, and are attaching his response.

We note, however, that although Plaintiffs previously permitted Delta to question Mr. Pixley about the relevance of the documents and interviews that he requested, in light of the clear directives of the February 5 Order that "Delta . . . must produce, without concern for responsiveness, relevance, privilege, etc., whatever Mr. Pixley requests in connection with his fulfillment of the directives in the November 19 order," there is no basis for Delta's current demand to question Mr. Pixley about the relevance of documents that he has requested in connection with his assignment. Moreover, Delta's previous questioning of Mr. Pixley about his requests has amounted to an inappropriate attempt to dissuade Mr. Pixley from seeking relevant documents and interviews, and to inappropriately alter the direction of Mr. Pixley's investigation. While you assert that you are seeking "clarification" of Mr. Pixley's request, you do not point to any ambiguity in his request, but simply argue that you do not believe that the documents that he has requested are relevant. Further, you falsely accuse Plaintiffs of directing Mr. Pixley to seek irrelevant documents, but Mr. Pixley himself determined which documents to seek based on the Court's November 19 Order.

If you would like to discuss, please let us know.

Thanks,
Daniel

---

**From:** Allen, Randall [mailto:Randall.Allen@alston.com]
**Sent:** Wednesday, February 20, 2013 9:50 PM
**To:** dlow@kotchen.com
**Cc:** Rutherford, Sam; 'Michael Mitchell'; 'Daniel Kotchen'
**Subject:** RE: Collection and Preservation Request

Daniel-
We conveyed our request for clarification from Mr. Pixley through you as a courtesy. It appears that you misused that courtesy to once again impede the efficient conduct of Mr. Pixley's review. If Mr. Pixley responded to those questions by email, please forward the response. Now, all I have is your filtered advocacy and no answer to my inquiry. I did not ask the questions of Mr. Pixley to draw argument from you or to determine whether Plaintiffs agree or disagree with something I have said. I wrote the email to determine Mr. Pixley's view and to clarify his request.

As an initial matter, there is no basis to suggest that any of the people listed in my email had any involvement in Delta's decision to adopt a first bag fee. If Mr. Pixley's charge is to determine if there are any additional documents related to Delta's decision to adopt the bag fee, why would you direct him to seek hard drives of individuals that even you don't suggest had anything to do with the bag fee decision?

I again invite you to arrange a call with Mr. Pixley to clarify these issues. You efforts to restrict that kind of cooperation by Delta and PwC serves only to hamper the process. I think it is in everyone's interest to get him the information he

1

needs and not to cover him up with information he does not need or want or for us to waste time collecting information that is not directed to Mr. Pixley's charge as described in Judge Batten's November 19 Order.

Regards,
Randall

---

**From:** Daniel Low [mailto:dlow@kotchen.com]
**Sent:** Tuesday, February 19, 2013 10:50 PM
**To:** Allen, Randall
**Cc:** Rutherford, Sam; 'Michael Mitchell'; 'Daniel Kotchen'
**Subject:** RE: Collection and Preservation Request

Randall,

I forwarded your e-mail to Mr. Pixley, as requested. "Network data" means home shares and group shares. Consistent with the Court's orders (including its 2/5/13 Order), please collect the hard drives and data Mr. Pixley has requested. These custodians consist of individuals from whom Delta has previously sought responsive documents. Plaintiffs disagree with your assertion that Plaintiffs' capacity allegations are irrelevant and no longer at issue.

Please let us know when Delta intends to produce the various documents and data that Mr. Pixley has requested.

Thanks,
Daniel

---

**From:** Allen, Randall [mailto:Randall.Allen@alston.com]
**Sent:** Tuesday, February 19, 2013 9:31 AM
**To:** dlow@kotchen.com
**Cc:** Rutherford, Sam; Michael Mitchell; Daniel Kotchen (dkotchen@kotchen.com)
**Subject:** RE: Collection and Preservation Request

Daniel - Please forward the below message to Bruce.
Thanks,
Randall

Bruce,
We have received the below email as well as the one later on Friday with five additional individuals. We are moving forward to arrange the collection process you describe, but had two questions:
1. Just to make sure we collect what you are looking for, can you explain what you mean by "Network Data"?
2. Some of the employees whose hard drives and data you are asking us to collect were not custodians in the case or were not bag-fee custodians. Before we charge ahead, we want to make sure we are all on the same page. Just as an example, Paul Blackmon, Mike Henning, Ted Hickey, Lim Samson and Jamie Vining are not custodians in this case. A number of others were custodians only for non-bag-fee related claims (that have since been abandoned by Plaintiffs). For example, Mel Fauscett (Managing Director Fleet Planning & Aircraft Acquisition), Dan Karwisch (Director Aircraft Acquisition & Sales), Ed Lohr (Director, fleet strategy); Nat Pieper (Vice President – Fleet Strategy & Transactions). Since these custodians are not related to Delta's first-bag-fee decision, we do not understand why we are being asked to collect these additional hard drives and other data.

If you would like to arrange a conference call to discuss, we would be happy to do so. We are simply trying to insure that we collect what you need and don't waste a lot of your time or ours collecting files that are not needed.

Thanks,
Randall

2

-----Original Message-----
From: Daniel Low [mailto:dlow@kotchen.com]
Sent: Friday, February 15, 2013 3:05 PM
To: Allen, Randall
Cc: 'Daniel Kotchen'; Rutherford, Sam; 'Michael Mitchell'
Subject: FW: Collection and Preservation Request

Randall,

Please see below request from Mr. Pixley . . . .

Thanks,
Daniel

-----Original Message-----
From: Bruce Pixley
Sent: Friday, February 15, 2013 2:40 PM
To: Daniel L. Low; Daniel Kotchen
Subject: Collection and Preservation Request

I am requesting custodian data to be collected and preserved.

Custodian Name        Data to be Collected and Preserved

Almeida, Stephen      Forensic image of Delta-issued computer(s),
Network Data
Brooks, Paul          Forensic image of Delta-issued computer(s),
Network Data
Premkumar, Smita      Forensic image of Delta-issued computer(s), Network
Data
Rossano, Mike         Forensic image of Delta-issued computer(s),
Network Data
Shepard, Rita         Forensic image of Delta-issued computer(s),
Network Data
Cloud, Catherine      Forensic image of Delta-issued computer(s),
Network Data
Fauscett, Mel         Forensic image of Delta-issued computer(s),
Network Data
Greer, Jill           Forensic image of Delta-issued
computer(s), Network Data
Karwisch, Dan         Forensic image of Delta-issued computer(s),
Network Data
Lohr, Ed              Forensic image of Delta-issued
computer(s), Network Data
Mutschler, Shannon    Forensic image of Delta-issued computer(s), Network
Data
Pieper, Nat           Forensic image of Delta-issued
computer(s), Network Data
Pietrzak, Dan         Forensic image of Delta-issued computer(s),
Network Data
Carr, Dana (aka Cook) Forensic image of Delta-issued computer(s), Network

3

Data

| | |
|---|---|
| Landers, Kent | Forensic image of Delta-issued computer(s), Network Data |
| Mapes, Tim | Forensic image of Delta-issued computer(s), Network Data |
| Talton, Martha Betsy | Forensic image of Delta-issued computer(s), Network Data |
| Conti, Brian | Forensic image of Delta-issued computer(s), Network Data |
| McGeehan, Suzanne | Forensic image of Delta-issued computer(s), Network Data |
| Newsom, Antonio | Forensic image of Delta-issued computer(s), Network Data |
| Scheper, Steve | Forensic image of Delta-issued computer(s), Network Data |
| Terry, Kyle | Forensic image of Delta-issued computer(s), Network Data |
| Shah, Neel | Forensic image of Delta-issued computer(s), Network Data |
| Steadman, David | Forensic image of Delta-issued computer(s), Network Data |

To ensure the accuracy of the collection and preservation of the custodian computer hard drives, I need a copy of Delta's internal records for ALL Delta custodians in this matter as it relates to company-issued computers.
The records should contain the custodian's name, the serial number of each issued computer, the date issued, and the date returned (if applicable).
These records should include the time period starting August 2008.

During the collection of the above listed data, PwC's Data Acquisition Record forms should be utilized and completed along with digital photographs. Additionally, PwC's Custodian Interview Form/Checklist should be utilized and completed. These forms are to ensure a complete collection of user-created documents that are stored in network locations, such as the user's home share, group share, and SharePoint. I will need a copy of these completed forms and photographs.

Once this data has been collected and preserved, I would like the data encrypted and then shipped to my attention.

I am assuming that PwC will be used to handle this collection. We can provide resources to assist in the collection and preservation effort if necessary.

Thank you,

Bruce

Bruce W. Pixley, CISSP, EnCE
Vice President, Computer Forensics
_____

1203 Flynn Rd, Suite 110
Camarillo, CA 93012
805.298.0031 (mobile)
805.389.1400 (office)
805.389.1446 (fax)

bpixley@precisiondiscovery.com

---

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

## Michael Mitchell

---

| | |
|---|---|
| **From:** | Bruce Pixley [bpixley@precisiondiscovery.com] |
| **Sent:** | Monday, February 25, 2013 4:51 PM |
| **To:** | Daniel L. Low; Daniel Kotchen |
| **Subject:** | Follow-up to requests of hard drive images and network-stored data |
| **Attachments:** | image001.png |

I understand that Delta was to conduct a reasonable diligent search for responsive documents in this case. In reviewing the data that I received in this matter, I found that Delta collected a limited subset of the data from custodians identified in my email. Therefore, I requested the collection of their hard drives and network-stored data.

I understand that Delta has concerns about my request and questions whether the data that I have requested is data that I want or whether fulfilling my request would somehow be a waste of time. I realize that additional custodians were added to this matter after the original custodians were identified and that not all of these custodians were involved in the first bag fee decision. I understand that there are some custodians from whom relevant documents were collected in this case, but who Delta does not consider custodians in this case. I also understand that some custodians were added because of their involvement in issues related to capacity rather than first bag fees, and that Plaintiffs are advancing allegations related to capacity issues insofar as they are relevant to first bag fee issues, and are not seeking damages related to a conspiracy to constrain capacity.

Nonetheless, I need the hard drive images and network-stored data collected from the custodians that I identified in my email in order to comply with the Court's November 19, 2012 Order, which requires that I identify the sources from which Delta has collected and preserved responsive documents, including whether Delta searched recoverable deleted items; whether there are sources of documents relevant to Delta's first bag fee decision that have not been collected or preserved by Delta; whether ESI relevant to Plaintiff's claims has been lost or destroyed; and any relevant sources of documents that are recoverable or that have not previously been searched.

Respectfully,

Bruce


Bruce W. Pixley, CISSP, EnCE
Vice President, Computer Forensics
_____
[cid:image001.png@01CE135D.51EA5100]

1203 Flynn Rd, Suite 110
Camarillo, CA 93012
805.298.0031 (mobile)
805.389.1400 (office)
805.389.1446 (fax)
bpixley@precisiondiscovery.com<mailto:bpixley@precisiondiscovery.com>

**Exhibit 1.2**

## Michael Mitchell

| | |
|---|---|
| **From:** | Daniel Low [dlow@kotchen.com] |
| **Sent:** | Sunday, May 19, 2013 12:46 AM |
| **To:** | 'Allen, Randall' |
| **Cc:** | 'Daniel Kotchen'; Michael Mitchell; 'Rutherford, Sam' |
| **Subject:** | RE: Fees |
| **Attachments:** | 2013 03 04 DELTA Spoliation and Sanctions - TIME REPORT.xlsx; 2013 03 04 Sanctions Expense Report.xls; 2013 05 06 April CF Invoice No. 7753.pdf; 2013 05 06 April ED Invoice No. 7757.pdf |

Randall,

Thanks for responding to Plaintiffs' e-mails regarding outstanding fees and expenses, which Plaintiffs have been requesting for over two months that Delta pay.  As you know, the Court's February 3, 2012 Order and the Court's November 19, 2012 Orders required Delta to reimburse Plaintiffs for, inter alia, "expenses and fees incurred in connection with the extended discovery period," and "all fees and costs associated with Plaintiffs' expert, incurred by Plaintiffs' counsel as a result of the September and November disputes, and incurred by Plaintiffs' counsel as a result of the directives of this Order."

We disagree with Delta's assertion that it is not required to pay any fees or expenses until after May 20.  The Court's Order states that "Delta will be responsible for paying for all fees and costs associated with Plaintiffs' expert," without any limitations regarding the timing of payments.  Nothing in the Court's Order contemplates that Mr. Pixley or Plaintiffs be required to wait over six months before being reimbursed for their costs or paid their fees.  You had Mr. Pixley's invoices for over three weeks without raising any questions or concerns until May 6.  As such, we do not understand your purported concern that you have not yet had enough time to review them.

You question whether TDS is acting at the direction of Mr. Pixley or at the direction of Plaintiffs' counsel.  I can confirm that TDS is acting solely at the direction of Mr. Pixley, and Plaintiffs have not communicated with TDS (other than to ensure that TDS signed a confidentiality agreement).  Mr. Pixley has assured us that the work performed by TDS relates to Mr. Pixley's report.

You raise a concern that the invoices that you have received from Plaintiffs are not as up-to-date as Precision Discovery's.  But this is an issue that Delta itself manufactured through its lengthy delay in responding to Plaintiffs' request for payment, and not a reasonable basis for further delay in paying Plaintiffs' or Mr. Pixley's invoices.  Also, we are attaching invoices for March and April for Plaintiffs' fees and expenses.

You suggest that we should not be forced to go through multiple rounds of negotiations over fees, but Delta has already forced Plaintiffs to go through multiple rounds of fee negotiations because of Delta's multiple rounds of discovery misconduct and resulting sanctions.  A delay until after Plaintiffs finish incurring fees and expenses related to Delta's discovery misconduct could take many more months, or longer.  For example, it is also unclear whether Delta will produce all non-privileged responsive documents and adequately supplement its discovery responses, or whether Plaintiffs will be forced to file a motion to compel.

With regards to your specific questions about Precision Discovery's invoices:

- All of the processing work was done in-house at Precision Discovery.  The processing included extraction of metadata and text, OCR of image only files, deduplication, and building of load file for hosting import.  The February invoice was for 460.88 GB at $390 per GB ($179,743.20) and the March invoice was for 1,962.15GB at $390 per GB (765,238.50).  The total of these two is 2,423.03 GB with the total charge of $944.981.70

- On the CF invoices, Precision Discovery charges an administrative services fee of 5% of the amount charged for professional fees. This administrative fee covers costs not directly billable, such as telecommunications, reproduction, and other administrative costs.

- A "non-billable" line item appears on the February forensic invoice: Pixley, Case management, 2.75 hours / $1,021.25. This entry was included by mistake.

- Hourly rates for Precision Discovery's staff in electronic discovery are $175 an hour, except: Thomas Avery $325 an hour; and Timothy Ross $325 an hour. Hourly rates for Precision Discovery's computer forensics staff are: Forensic Examiner, $275 an hour; Forensic Manager or Director, $325 an hour; Senior Director and above, $375 an hour; travel time, $125 an hour; expert witness testimony and preparation, $450 an hour. The fees charged by Precision Discovery for this investigation are in line for the type of work being conducted in this matter and are in line with the fees charged by Precision Discovery to perform similar investigations of this complexity and requiring this level of expertise.

I am attaching April invoices from Precision Discovery. If Plaintiffs do not receive payment of the various outstanding invoices by May 29, we intend to file a fee motion with the Court.

Thanks,
Daniel

---

**From:** Allen, Randall [mailto:Randall.Allen@alston.com]
**Sent:** Monday, May 06, 2013 6:30 AM
**To:** dlow@kotchen.com
**Cc:** 'Daniel Kotchen'; 'Michael Mitchell'; Rutherford, Sam
**Subject:** RE: Fees

Daniel – I write to address the various emails you have sent recently requesting immediate payment of the following:
- Statements from Plaintiffs' counsel for fees and expenses from July 2012 through February 28, 2013 totaling $1,335,398.00;
- Invoices from Precision Discovery LLC from November 2012 through March 31, 2013, totaling $1,579,765.96; and
- An invoice from Trusted Data Solutions LLC ("TDS") for $259,055.63.

We do not believe Delta is required to make interim fee and expense payments until the process set out in the Court's November 19, 2012 Order ("Order") has been completed for several reasons.

First, nothing in the Court's November 19 Order contemplates interim fee payments during the process set forth in the Order, which, as you know, was originally supposed to be completed within 30 days. In light of the fact that the process has been extended to 6 months, we asked for a preliminary statement of fees and costs so that Delta could have an understanding what had been incurred to date, as explained in my March 29 email. Our request was also made to avoid the situation that has occurred in the past where we have had, in our view, insufficient time to consider your fee requests. Consistent with the process outlined in the Court's Order, we believe any payments should be made once the review process defined by the Court has been completed.

Second, as last week's events demonstrate, Delta is currently receiving invoices from several different parties at different times for different time periods, with more to come and we have no idea what the amounts of those will be or whether they will be consistent with the Court's Order. To date, Delta has received statements from Plaintiffs' counsel only through February and from Precision Discovery through March. Thus, Delta does not yet have any statements from Plaintiffs' counsel from March, April and May, or from Precision Discovery from April and May. In addition, Delta also

has no way of knowing what other invoices it might receive from TDS and when. This is particularly important given your email this week attaching a one page invoice from TDS of more than a quarter of a million dollars. It is not at all clear from the invoice that the work by TDS is consistent with what we understood TDS was retained for and it's unclear whether those tasks relate to the charge in the Court's November 19 Order without seeing the report.

Third, Plaintiffs appear to take the position that Delta should pay TDS even though the Court's Order states Delta is required to pay certain fees and expenses of Plaintiffs' counsel and Plaintiffs' expert. The Order does not provide that Delta is required to pay invoices from third parties without any statement or indication that the work performed relates to Mr. Pixley's work (and indeed seems to be contrary to the stated purpose for that vendor's retention). Delta believes the order was structured this way to encourage reasonableness in deciding what work needed to be done pursuant to the Court's instructions. Delta does not know how TDS's work is connected to Mr. Pixley's work until Delta receives the report (or, at a minimum, more detailed information about how the work performed relates to Court's instructions). Notably, TDS's was apparently retained by Kotchen & Low, not Precision Discovery, creating uncertainty about whether TDS's work was in fact performed at the direction of Kotchen & Low instead of Mr. Pixley, which would not be consistent with the Court's Order.

For the foregoing reasons, Delta does not believe interim fee and expense payments are required or the proper way to go at this stage. Rather than addressing the invoices and statements on a piecemeal basis in multiple rounds of negotiations, and Delta making multiple payments to several different parties, it would be more efficient for Delta to pay any undisputed fees and expenses at the end of the process (as contemplated by the Court's Order), and for the parties to address any disputes about the fees at that time. Since the report is due in a few weeks, waiting until it is finished should not cause any significant issues for you or Mr. Pixley. As you know, we are required to quickly review Mr. Pixley's report and potentially respond within 21 days. Thus, if you would like to advance this issue following delivery of the report, please provide us updated statements for you and for Mr. Pixley's team. If you can give us up to date information, we will try and review it and let you know if we have any questions before the report comes out. That will move us closer to being in a position to discuss a resolution of the fees and costs in a timely manner.

In the meantime, in reviewing the statements from Precision Discovery you sent, we have a few questions about them. Specifically:

- Of the $1,579,765.96 in fees and expenses set forth in the Precision Discovery invoices, $944,981.70 is attributed to two items within the "Disbursements" section of the February and March 2013 "ED" invoices. The "description" for these items says merely "All File Native Processing (Single Tier)" followed by what appears to be the amount of data that was "processed." In light of the fact that these amounts make up almost 60% of the total amount, please provide additional detail regarding what work is included and how the amounts were calculated so that we can better understand what these entries mean. In addition, it is unclear from the invoices whether the "native processing" was performed at and/or by Precision or whether the data was sent to or shared with a third-party. We assume the former, but please confirm.

- Each of the invoices with "CF" on them (which we assume means the invoices are from the "Computer Forensics" group at Precision Discovery) contains an entry called "Admin Fee." The total amount of these "admin fees" is $26,959.38. The invoices do not provide any explanation of these fees. Please explain what the "admin fee" represents and how it is calculated.

- There is at least one entry that states the associated task was "non-billable." Please confirm whether this entry was included by mistake. If not, please identify any other "non-billable" items on the invoices that Delta is being requested to pay.

- The invoices do not state the standard hourly fees for each of the individuals who have billed time to this matter. Please let us know the standard hourly fees for each individual from Precision Discovery working on this matter. If the fees being charged for this matter are not the standard fees, please provide an explanation for

any departure from the standard fees. Additionally, please let us know whether the hourly and data processing and storage rates reflected on these invoices are the rates normally charged by Precision Discovery on matters of this size.

We look forward to receiving responses to these questions. If you would like to discuss these issues by phone, I am, as always, happy to do so.

Thank you.
Randall

---

**From:** Daniel Low [mailto:dlow@kotchen.com]
**Sent:** Tuesday, April 30, 2013 10:41 PM
**To:** Allen, Randall
**Cc:** 'Daniel Kotchen'; 'Michael Mitchell'; Rutherford, Sam
**Subject:** RE: Fees

Randall,

I'm attaching an invoice from TDS Data Solutions for payment.

Thanks,
Daniel

---

**From:** Daniel Low [mailto:dlow@kotchen.com]
**Sent:** Friday, April 26, 2013 12:56 AM
**To:** 'Allen, Randall'
**Cc:** 'Daniel Kotchen (dkotchen@kotchen.com)'; 'Michael Mitchell'; 'Rutherford, Sam'
**Subject:** RE: Fees

Randall,

Thanks for your response.

In light of the fact that you have finished responding to Mr. Pixley's data requests, I am attaching Plaintiffs' detailed time and expense reports. These documents are subject to your previous agreement that they will only be used to address the fee application and will not waive any privilege. I have edited the documents to remove payments to Precision Discovery from Plaintiffs' expenses to avoid double-counting against the invoices that have already been sent to you, and have corrected a few minor typos. The total amount of Plaintiffs' reimbursable fees and expenses through the end of February is $1,335,398.

We request that Precision Discovery's invoices be paid promptly, and request that you pay Plaintiffs' invoices within two weeks. *See* Order at 77 (Dkt. #263) (providing parties two weeks to resolve earlier fee dispute).

Please let us know when Plaintiffs can expect to receive payment for Plaintiffs' and Precision Discovery's fees and expenses, which can be wired to Kotchen & Low's bank account.

Thanks,
Daniel

---

**From:** Allen, Randall [mailto:Randall.Allen@alston.com]
**Sent:** Wednesday, April 24, 2013 3:09 PM

**To:** dlow@kotchen.com
**Cc:** Daniel Kotchen (dkotchen@kotchen.com); Michael Mitchell; Rutherford, Sam
**Subject:** RE: Fees

Daniel – I believe we have finished our delivery of data to Bruce. There is, potentially, one additional item we communicated with Bruce about today, but other than that, we are finished.

We are reviewing the invoices you sent and will respond to your email on that subject separately either this week or next.

Sincerely,
Randall

---

**From:** Daniel Low [mailto:dlow@kotchen.com]
**Sent:** Friday, April 19, 2013 7:07 PM
**To:** Allen, Randall
**Cc:** 'Daniel Kotchen'; 'Michael Mitchell'; Rutherford, Sam; 'Robert A. Klinck'
**Subject:** RE: Fees

Randall,

Please let Plaintiffs and Mr. Pixley know when Delta intends to pay Mr. Pixley's invoices. *See* Order at 9, Dkt. #375.

Also, please let us know when Delta expects to finish responding to Mr. Pixley's data requests.

Thanks,
Daniel

---

**From:** Daniel Low [mailto:dlow@kotchen.com]
**Sent:** Friday, April 12, 2013 6:38 PM
**To:** Allen, Randall (Randall.Allen@alston.com)
**Cc:** 'Daniel Kotchen'; 'Michael Mitchell' (mmitchell@bsfllp.com); sam.rutherford@alston.com; 'Robert A. Klinck'
**Subject:** RE: Fees

Randall,

Thanks for your response.

In light of the Court's clear directive that "Delta will be responsible for paying all fees and costs associated with Plaintiffs' expert" (Order at 9, Dkt. #375), and in light of the fact that you have not expressed any concerns about Precision Discovery's fees and costs, we ask that Delta promptly pay the fees and expenses that Precision Discovery has incurred through the end of March, which total $1,579,765.96.

Based on your agreement that our disclosure of time and expense records will not constitute a waiver and will not be used for any purpose besides addressing Plaintiffs' fee request, I am attaching Precision Discovery's detailed invoices.

We do not wish to interfere with Delta's efforts to respond to Mr. Pixley's data requests. Please let us know when Delta expects to finish responding to Mr. Pixley's data requests, and we will forward Plaintiffs' detailed time and expenses for review and payment. Plaintiffs' time and expense records reflect the reasonableness of Plaintiffs' fee request, and reflect that your concerns about Plaintiffs engaging in "wasteful activities" are unfounded.

Thanks,
Daniel

---

**From:** Allen, Randall [mailto:Randall.Allen@alston.com]
**Sent:** Friday, March 29, 2013 2:46 PM
**To:** dlow@kotchen.com
**Cc:** 'Daniel Kotchen'; Rutherford, Sam; 'Michael Mitchell'; 'Flint, David'; 'Cale Conley'; 'Heald, Jared'
**Subject:** RE: Fees

Daniel,

On March 1, Delta consented to an additional extension for the completion of Mr. Pixley's work. That extension meant that a process originally envisioned to last thirty days would instead be six months. In light of that, my March 1 email asked for a preliminary statement of fees and costs, so that Delta could have an understanding what had been incurred to date. Our request was also made to avoid the situation that has occurred in the past where we have had, in our view, insufficient time to consider your fee request. We had concerns about the reasonableness of any additional request for attorneys' fees you might seek in light of the manner in which your firm has unnecessarily involved its attorneys in Mr. Pixley's review for such tasks as simply watching Mr. Pixley or his associates copy data for hours on end, often with more than one lawyer engaged in such wasteful activities.

Instead of either agreeing or refusing Delta's straightforward request, your initial response on March 6 said that a preliminary statement would only be provided on the condition that Delta agree to pay the amount on the statement or be subject to motion practice at your discretion. Delta did not agree. Your subsequent communications unilaterally acted on your own March 6 proposal, demanding payment and threatening motion practice in the middle of Mr. Pixley's work if Delta did not pay by your arbitrary deadline.

We do not believe this is the appropriate time to address potential disagreements about fee statements because it would only serve as a distraction from the ongoing work and process established by the court. As you know, Mr. Pixley is wrapping up his work and in that connection, he has recently made a number of very large data requests. We received two additional requests directly from him on Tuesday evening, and more requests on Wednesday. I am sure you will agree that his requests should receive priority at this stage. We simply do not have time to give a fee application the attention that would be required at this point. And there is no reason to accelerate an application for fees and expenses, which should be handled at the conclusion of Mr. Pixley's work. Thus, to the extent there are disagreements about the fees or costs claimed by Plaintiffs, those should be addressed at the end of the process, not in the middle of it or more than once (as you seem to suggest given your threat of motion unless we accede to your fee demand sight unseen), which would burden the parties and the court.

Subject to my comments above, if you think there is a need to handle this issue on a different timetable, we would be willing to consider any reasonable proposal you would like to make. Whenever we engage in discussions about a fee application, we cannot seriously consider such a request without a detailed statement of fees and expenses occurred along the lines you have previously provided. Once we receive that, we can determine how best to proceed. It is not reasonable for you to threaten to file a motion with the court unless we accede to your demand that Delta pay almost $2 million in fees and expenses by April 8 -- a completely arbitrary deadline for which you provide no basis. We would agree that any information you provide in to us in connection with your fee application will not constitute a waiver of the privilege and Delta will use the information provided only for purposes of addressing any fee application.

Thank you,
Randall

---

**From:** Daniel Low [mailto:dlow@kotchen.com]
**Sent:** Monday, March 25, 2013 8:02 PM
**To:** Allen, Randall

**Cc:** 'Daniel Kotchen'; Rutherford, Sam; 'Michael Mitchell'; 'Flint, David'; 'Cale Conley'; 'Heald, Jared'
**Subject:** RE: Fees

Randall,

Please see attached letter.

Thanks,
Daniel

---

**From:** Daniel Low [mailto:dlow@kotchen.com]
**Sent:** Monday, March 18, 2013 8:00 PM
**To:** 'Allen, Randall'
**Cc:** 'Daniel Kotchen'; 'Rutherford, Sam'; 'Michael Mitchell'
**Subject:** RE: Extension

Randall,

You asked for a statement of Plaintiffs' fees and costs through the end of February 2013 for which they are entitled to reimbursement.

The Court's February 3, 2012 Order and the Court's November 19, 2012 Orders required Delta to reimburse Plaintiffs for, inter alia, "expenses and fees incurred in connection with the extended discovery period," and "all fees and costs associated with Plaintiffs' expert, incurred by Plaintiffs' counsel as a result of the September and November disputes, and incurred by Plaintiffs' counsel as a result of the directives of this Order." Plaintiffs' reimbursable fees and costs from July 2012 through February 2013 (excluding the portion of July 2012 fees and costs for which Plaintiffs previously invoiced Delta in July 2012) amount to a total of $1,985,035.78. Of this amount, $655,634.83 was incurred by Precision Discovery. Please let us know when Plaintiffs and Mr. Pixley can expect payment, or whether we will be required to file a fee motion with the Court to obtain prompt payment.

As I indicated in my March 6 e-mail, we would be happy to provide you with a detailed invoice if Delta agrees to use the invoice only in connection with the fee request, and agrees that there will be no privilege waiver based on the disclosures in the invoice.

Thanks,
Daniel

---

**From:** Daniel Low [mailto:dlow@kotchen.com]
**Sent:** Wednesday, March 06, 2013 5:18 PM
**To:** 'Allen, Randall'
**Cc:** 'Daniel Kotchen'; 'Rutherford, Sam'; 'Michael Mitchell'
**Subject:** RE: Extension

Randall,

Thanks for your March 1 response to my February 25 e-mail. Plaintiffs are hopeful that Delta will promptly provide documents and data to Mr. Pixley so that he can move forwards towards completing his analysis and report.

You ask Plaintiffs to provide a statement of Mr. Pixley's and Plaintiffs' reimbursable fees and expenses to date. Plaintiffs will be happy to provide you with a detailed invoice of fees and expenses on the condition that Delta agrees that: the documentation provided by Plaintiffs will be used only for purposes of the fee request; there is no privilege waiver based on the disclosure of information in connection with the fee request; Delta will promptly pay the undisputed amount of the fees and expenses owed; and for any disputed amounts in the preliminary fee statement, Delta agrees

that Plaintiffs will be entitled to file a fee motion with the Court now (or at their discretion, Plaintiffs will be entitled to delay their motion to combine it with a future fee request).

In the event that Plaintiffs' requested extension is granted, you ask for a weekly call with Mr. Pixley beginning the week of March 11 "to insure that the collection of data and completion of the review stay on target." You describe this as a "typical" project management tool, but Plaintiffs are unaware of any situation in which a party's counsel held weekly calls with the opposing party's expert to ensure that the opposing party's expert "stay[ed] on target." If you have any examples that you can provide us, we would be very interested in hearing about them. As we've previously explained, Plaintiffs are concerned about Delta's efforts to dissuade Mr. Pixley from seeking documents and interviews that he has determined are relevant to his report and about Delta's efforts to improperly alter the direction of his investigation. We do believe, however, that a regular call with Delta's IT staff and vendors regarding the status of outstanding data requests would be productive. *See* E-mail from D. Kotchen to R. Allen (Nov 28, 2012) (agreeing to Delta's proposed call with Mr. Pixley if Delta had "knowledgeable, technical employees on the phone who can answer background questions that Mr. Pixley might have"). Considering that data requests dating back to November 2012 have not yet been fulfilled, the best course to ensure that Mr. Pixley's review "stays on target" is to complete the production of outstanding data as soon as possible.

In your e-mail, you suggest that we should "focus on completing this review," but fail to address the fact that Mr. Pixley has not yet received data that he requested over three months ago, and refuse to commit to a date by which the production will be complete. Mr. Pixley cannot focus on completing his review until he has all of the necessary data. If Delta wants Mr. Pixley to complete his review, it must provide him with the documents and data that he has requested.

Thanks,
Daniel

---

**From:** Allen, Randall [mailto:Randall.Allen@alston.com]
**Sent:** Friday, March 01, 2013 3:39 PM
**To:** dlow@kotchen.com
**Cc:** 'Daniel Kotchen'; Rutherford, Sam; 'Michael Mitchell'; Atkins, Alden L. (aatkins@velaw.com); James P. Denvir (jdenvir@bsfllp.com); 'Fones, Roger W.'
**Subject:** RE: Extension

Daniel-
I am writing in response to your request that Delta consent to another extension for Mr. Pixley to complete his work. As we discussed last December, when we consented to the first extension of three months, it was Delta's hope that Mr. Pixley could complete his review within the extended four month period. You have now asked us to agree to extend the review period again. We have worked hard with Mr. Pixley to complete this review. He has requested and we have provided to him a very large quantity of data. While we intend to continue our efforts to cooperate with Mr. Pixley, we believe it is also important that we all focus now on completing this review. It is in that spirit that Delta will not oppose a sixty day extension from the current March 19 deadline.
You and I have exchanged a number of emails about what remains to be provided to Mr. Pixley. I will not rejoin that issue here. Additionally, Mr. Pixley has made a number of recent requests for a very large volume of data. We have already provided a significant quantity of that data to him this week and hope to be able to complete delivery of the remainder of that data shortly. We intend to complete all outstanding requests in the near future. I have previously written you about scheduling any remaining interviews that may need to be done, but have not yet heard back from you. We are ready to organize any remaining interviews. We believe that there is no reasonable basis for believing that this project cannot be completed in what will now be a six month time frame.
You have suggested a rolling extension that will have no set or defined conclusion. That is not the approach the Court adopted or, in our view, the right approach. While deadlines are sometimes difficult, they have a way of moving all parties forward. It is not, in our view, a good idea to eliminate the deadline or to put it solely in the control of one of the parties. With this new 2 month extension, we will have taken a process the Court initially envisioned as a thirty day review and turned it into a six month review. That should be sufficient to complete this process and there should not be any reason for further extensions. Assuming the Court agrees with your requested extension, we suggest that weekly

calls be scheduled with Mr. Pixley beginning the week of March 11 to insure that the collection of data and completion of the review stay on target.   This is a fairly typical project management tool that will benefit all parties and ultimately the Court.  Please let us know what times would work for Mr. Pixley to participate in such calls.

Additionally, since we have accommodated your requests, we would like to get a preliminary statement of Mr. Pixley's fees and cost for the project through February.  Additionally, if Plaintiffs intend to request any fees, we make a similar request of them.

If you would like to discuss this matter further, let us know when you will be available and we will arrange a call.

Regards,
Randall

**Randall L. Allen**
**Alston & Bird LLP**
1201 W. Peachtree St. | Atlanta, Ga. 30309
404.881.7196 – *direct* | 404.253.8473 – *fax*
randall.allen@alston.com

**Exhibit 1.3**

# Michael Mitchell

**From:** Daniel Low [dlow@kotchen.com]
**Sent:** Monday, March 18, 2013 1:43 PM
**To:** 'Allen, Randall'
**Cc:** 'Daniel Kotchen'; 'Rutherford, Sam'; Michael Mitchell
**Subject:** RE: Response to backup tape questions

Randall,

Mr. Pixley is available to talk at 5 p.m. Eastern today.  We can use the following number:

Conference Dial-in Number: (712) 432-0850 Participant Access Code: 1079344#

It is disingenuous of you to suggest that my instructions for you not to make ex parte contacts with Mr. Pixley delayed delivery of the tape data that he requested.  Plaintiffs did not object to Delta sending data (as opposed to documents) to Mr. Pixley, and Delta had the opportunity to provide this data to Mr. Pixley in person during multiple meetings in January.  Delta never requested permission to send this data to Mr. Pixley, and data responsive to this request was not included in your January 29 e-mail identifying information that Delta was prepared to send Mr. Pixley but was withholding based on Plaintiffs' instructions not to engage in unauthorized ex parte contacts with Mr. Pixley. The Court's February 5 Order allowed Delta to provide data directly to Mr. Pixley, and Delta has not yet provided Mr. Pixley with the tape data that he requested on January 7.

It is also disingenuous of you to suggest that you believed that request #8 of Mr. Pixley's January 7 requests had already been fulfilled.  Plaintiffs have repeatedly indicated that request #8 of Mr. Pixley's January 7 requests is still open, and Delta agreed that the request was still open.  See E-mail from D. Low to R. Allen (Jan. 14, 2013) (memorializing January 11 discussion with Mr. Pixley); E-mail from R. Allen to D. Low (Jan. 22, 2013) (acknowledging that the request was still open); E-mail from D. Low to R. Allen (Feb. 6, 2013); E-mail from D. Low to R. Allen (Feb. 25, 2013); E-mail from D. Low to R. Allen (Mar. 12, 2013); E-mail from B. Pixley to R. Allen (Mar. 15, 2013).  Despite Plaintiffs' and Mr. Pixley's multiple requests for information about when Delta would respond to Mr. Pixley's open requests, including request #8 of Mr. PIxley's January 7 requests, Delta has repeatedly refused to provide a response.  See E-mail from D. Low to R. Allen (Feb. 25, 2013); E-mail from D. Low to R. Allen (Mar. 12, 2013); E-mail from B. Pixley to R. Allen (Mar. 15, 2013).  Mr. Pixley requested the backup tape data on January 7.  At our January 11 meeting, Mr. Pixley clarified any requests that Delta believed were ambiguous, and Delta never raised any further questions about the ambiguity of any of Mr. Pixley's requests. In a March 6 e-mail, Mr. Pixley requested a meeting with eMag to collect this data.  Delta refused to respond to this request.  Mr. Pixley sent another follow-up request on March 15. It was not until your e-mail today that you claimed any confusion about Mr. Pixley's request.

Plaintiffs are disturbed by the suggestion in your e-mail that you may not provide Mr. Pixley with access to the data he has requested on Wednesday, especially after Delta represented to the Court that it was cooperating with Mr. Pixley and was not refusing to respond to this (or any other) request.
See Letter from R. Allen to J. Batten (Mar. 5, 2013).

During our call this afternoon, we would appreciate your providing Mr. Pixley a response to his March 15 e-mail, including when he can expect to receive the remainder of the documents and data that he requested.

Thanks,
Daniel

-----Original Message-----
From: Allen, Randall [mailto:Randall.Allen@alston.com]
Sent: Monday, March 18, 2013 12:20 PM
To: bpixley@precisiondiscovery.com
Cc: 'Daniel Kotchen'; Rutherford, Sam; 'Michael Mitchell'; dlow@kotchen.com
Subject: RE: Response to backup tape questions

Bruce-
There has obviously been some confusion on this issue and I think it would be helpful if we
could get on the phone and talk through it.  Please let me know if you are available.
Following our meeting on January 11,  we sent you information from eMag that had been delayed
in delivery as a result of Daniel's instructions that we stop sending information directly to
you, which included among other things a full listing of the mailboxes extracted by eMag.  I
was under the impression that the eMag  information would either resolve or reduce the
request you had made January 7.  When we received your March 6 request, we promptly followed
up with eMag.  For the last week, eMag has been working to restore and make a copy of all of
the data it has and that should be ready for you on Wednesday.  It is a very large amount of
data, so we will monitor the copying process and let you know if there are any issues. Your
March 6 email made clear that you were looking for additional information that eMag does not
have.  However, a number of the tapes you asked for copies of in your email this weekend were
not (based on my reading) previously requested.  More specifically, six of the tapes in your
March 17 request were never restored, and no mailboxes were extracted from them (Tapes 196-
198, 200-202). As such, yesterday's request appears to expand the scope of any prior request,
including the January 7, 2013 request.  In any event I propose a call to discuss this so we
can determine if there are alternatives to doing this that do not require taking the tapes to
New York or disclosing any back-up tapes to a third party outside of Delta's control.  I am
available anytime today except 1-3 or 4-4:30 eastern.
I am also available tomorrow, but given that you would like to have someone here on
Wednesday, I suggest we talk today if that is possible.

Thanks,
Randall

-----Original Message-----
From: Daniel Low [mailto:dlow@kotchen.com]
Sent: Sunday, March 17, 2013 5:25 PM
To: Allen, Randall
Cc: 'Daniel Kotchen'; Rutherford, Sam; 'Michael Mitchell'
Subject: FW: Response to backup tape questions

Randall,

Please see below response from Mr. Pixley.

Thanks,
Daniel

-----Original Message-----
From: Bruce Pixley [mailto:bpixley@precisiondiscovery.com]
Sent: Sunday, March 17, 2013 4:28 PM
To: Daniel L. Low; Daniel Kotchen
Cc: Tom Avery; Jeffrey Hudson; Kinny Chan
Subject: Response to backup tape questions

Response to Randall's questions regarding the backup tapes:

Case 1:09-md-02089-TCB Document 187 Filed 04/25/13 Page 66 of 74

I have never received any Exchange data from the backup tapes I requested on January 7, 2013. However, I did receive Exchange data from the backup tapes I requested on February 15, 2013.

Since there has been a significant delay in obtaining this data and I have a short time schedule to respond to the Court Order for a May deadline, I propose the following:

1)      My examiner, John Ruiz, would physically take custody of the data at PwC's office in Atlanta.

2)      He will hand-carry the tapes (not check them as baggage) and return to our office in New York.

3)      He will work directly with our tape vendor, Trusted Data Solutions (TDS), which is also located in New York. I have been working with them for the past 5+ years to handle tape data and Exchange backups

4)      We will provide TDS with copies of the Court's January 21, 2010 Initial Case Management Order and the Court's November 19, 2012 Order, and obtain TDS's written commitment to abide by the confidentiality provisions of those orders.

5)      On a daily basis, he will be on-site with TDS to work with them as they:

a.       Extract the tape data

b.      Verify the data based on the tape scans provided by Delta

c.       Export custodian mailboxes from the Exchange EDB volumes.

6)      He will encrypt the custodian mailboxes and ship it to my lab in CA for comparison.

I understand that eMag was able to locate the extracted Exchange data from tapes 71-77 (7 tapes) and 80-86 (7 tapes). John will pick up the hard drive(s) containing this data and I want him to pick up the following tapes:

63
157
158
188
132-138 (7 tapes)
159
173
179
180
181
183
196-202 (7 tapes)

Bruce

Bruce W. Pixley, CISSP, EnCE
Vice President, Computer Forensics
_____
[cid:image001.png@01CE22FC.F39F4F10]

1203 Flynn Rd, Suite 110
Camarillo, CA 93012
805.298.0031 (mobile)
805.389.1400 (office)
805.389.1446 (fax)
bpixley@precisiondiscovery.com<mailto:bpixley@precisiondiscovery.com>

_____

NOTICE: This e-mail message and all attachments may contain legally privileged and
confidential information intended solely for the use of the addressee. If you are not the
intended recipient, you are hereby notified that you may not read, copy, distribute or
otherwise use this message or its attachments. If you have received this message in error,
please notify the sender by email and delete all copies of the message immediately.

**Exhibit 1.4**

## Michael Mitchell

| | |
|---|---|
| **From:** | Bruce Pixley [bpixley@precisiondiscovery.com] |
| **Sent:** | Tuesday, June 11, 2013 5:43 PM |
| **To:** | Allen, Randall |
| **Subject:** | RE: 09-md-2089-TCB Delta/AirTran MDL:  Rescheduling June 18 hearing |
| **Attachments:** | Account Statement for Delta Air Tran Baggage Fee Antitrust Matter.pdf; In re Delta - Air Tran Baggage Fee Antitrust Invoices.pdf |

Randall,

The PDF of the account statement provides a summary of all invoices, including which ones
have been paid (and by whom) and which ones are outstanding.

A second PDF contains all of the invoices.

These were sent to the court last night. This is your copy.

Bruce


-----Original Message-----
From: Allen, Randall [mailto:Randall.Allen@alston.com]
Sent: Tuesday, June 11, 2013 8:33 AM
To: Bruce Pixley
Subject: FW: 09-md-2089-TCB Delta/AirTran MDL: Rescheduling June 18 hearing

Bruce,
Please copy us on whatever you submit to the Court in response to Ms. Snedeker's email below.

Thank you,
Randall


-----Original Message-----
From: Alice_Snedeker@gand.uscourts.gov [mailto:Alice_Snedeker@gand.uscourts.gov]
Sent: Thursday, June 06, 2013 8:54 AM
To: Allen, Randall
Cc: aatkins@velaw.com; bmcculley@mcculleymccluer.com; Bruce Pixley; BREIN@WILEYREIN.COM;
bwood@rpwb.com; cale@conleygriggs.com; CHarley@chitwoodlaw.com; dbain@bain-law.com; Flint,
David; dgustafson@gustafsongluek.com; dhedlund@gustafsongluek.com; dkotchen@kotchen.com;
dlow@kotchen.com; garenson@kaplanfox.com; goldman@gsk-law.com; g.blanchfield@rwblawfirm.com;
hrowell@rpwb.com; jabraham@aftlaw.com; jad@davis-adams.com; jdenvir@bsfllp.com;
jhartman@mofo.com; jward@rpwb.com; lnussbaum@gelaw.com; mchitwood@chitwoodlaw.com; Kraynak,
Michelle; mmitchell@bsfllp.com; Berreth, Nowell; psanders@sgrlaw.com; RFones@mofo.com;
richard@conleygriggs.com; rkaplan@kaplanfox.com; rkillorin@chitwoodlaw.com;
rklinck@kotchen.com; Rutherford, Sam; sgant@bsfllp.com; smccluer@mcculleymccluer.com;
trhodes@sgrlaw.com; ZBanks@chitwoodlaw.com
Subject: RE: 09-md-2089-TCB Delta/AirTran MDL: Rescheduling June 18 hearing

Counsel,

Based on the below email, Judge Batten considers the issue with production of the report
resolved. If that is not the case, let me know.

Bruce: On or before Tuesday, June 11 at 3 p.m. EST, please email me all invoices you have generated related to this case and indicate which ones have been paid (and by whom) and which ones are outstanding. Depending on how detailed the cost breakdown is on the invoices, the judge may require the production of additional billing information. Feel free to call me if you have any questions.

Thank you,

Alice Snedeker
Law Clerk, Hon. Timothy C. Batten, Sr.
United States District Court
Northern District of Georgia
404-215-1418
alice_snedeker@gand.uscourts.gov


From:    "Allen, Randall" <Randall.Allen@alston.com>
To:      "Flint, David" <dflint@SWFLLP.com>,
         "'Alice_Snedeker@gand.uscourts.gov'"
         <Alice_Snedeker@gand.uscourts.gov>
Cc:      "aatkins@velaw.com" <aatkins@velaw.com>,
         "bmcculley@mcculleymccluer.com"
         <bmcculley@mcculleymccluer.com>, Bruce Pixley
         <bpixley@precisiondiscovery.com>, "BREIN@WILEYREIN.COM"
         <BREIN@WILEYREIN.COM>, "bwood@rpwb.com" <bwood@rpwb.com>,
         "cale@conleygriggs.com" <cale@conleygriggs.com>,
         "CHarley@chitwoodlaw.com" <CHarley@chitwoodlaw.com>,
         "dbain@bain-law.com" <dbain@bain-law.com>,
         "dgustafson@gustafsongluek.com"
         <dgustafson@gustafsongluek.com>, "dhedlund@gustafsongluek.com"
         <dhedlund@gustafsongluek.com>, "dkotchen@kotchen.com"
         <dkotchen@kotchen.com>, "dlow@kotchen.com" <dlow@kotchen.com>,
         "garenson@kaplanfox.com" <garenson@kaplanfox.com>,
         "goldman@gsk-law.com" <goldman@gsk-law.com>,
         "g.blanchfield@rwblawfirm.com" <g.blanchfield@rwblawfirm.com>,
         "hrowell@rpwb.com" <hrowell@rpwb.com>, "jabraham@aftlaw.com"
         <jabraham@aftlaw.com>, "jad@davis-adams.com"
         <jad@davis-adams.com>, "jdenvir@bsfllp.com"
         <jdenvir@bsfllp.com>, "jhartman@mofo.com" <jhartman@mofo.com>,
         "jward@rpwb.com" <jward@rpwb.com>, "lnussbaum@gelaw.com"
         <lnussbaum@gelaw.com>, "mchitwood@chitwoodlaw.com"
         <mchitwood@chitwoodlaw.com>, "Kraynak, Michelle"
         <mkraynak@SWFLLP.com>, "mmitchell@bsfllp.com"
         <mmitchell@bsfllp.com>, "Berreth, Nowell"
         <Nowell.Berreth@alston.com>, "psanders@sgrlaw.com"
         <psanders@sgrlaw.com>, "RFones@mofo.com" <RFones@mofo.com>,
         "richard@conleygriggs.com" <richard@conleygriggs.com>,
         "rkaplan@kaplanfox.com" <rkaplan@kaplanfox.com>,
         "rkillorin@chitwoodlaw.com" <rkillorin@chitwoodlaw.com>,
         "rklinck@kotchen.com" <rklinck@kotchen.com>, "Rutherford, Sam"
         <Sam.Rutherford@alston.com>, "sgant@bsfllp.com"
         <sgant@bsfllp.com>, "smccluer@mcculleymccluer.com"
         <smccluer@mcculleymccluer.com>, "trhodes@sgrlaw.com"
         <trhodes@sgrlaw.com>, "ZBanks@chitwoodlaw.com"
         <ZBanks@chitwoodlaw.com>
Date:    06/05/2013 09:54 AM

2

Subject:        RE: 09-md-2089-TCB Delta/AirTran MDL:  Rescheduling June 18
                hearing


Ms. Snedeker,

The protocol set out in the Court's November 19, 2012 Order instructed Delta to provide Mr.
Pixley information without regard to privilege or relevance, and the report submitted reveals
and discusses such information.
Anticipating this, the Court's Order also provided that the report was to be provided only to
the Court in camera and to Delta's counsel.  As such, Delta feels strongly that Plaintiffs'
counsel should not be provided an un-redacted copy of the report.  Mr. Flint has asked us for
a copy of the report as well and we have informed him that we will provide a redacted copy of
the report subject to conditions we have previously agreed with Plaintiffs.  We plan to do
that by Monday, June 10.
I have discussed this approach with Mr. Flint and believe it resolves his request to the
Court.  If the Court feels that any further action is required on Mr. Flint's request at this
time, Delta request leave to brief the issue for the Court.
Thank you,
Randall Allen


Randall L. Allen
Alston & Bird LLP
1201 W. Peachtree St. | Atlanta, Ga. 30309
404.881.7196 - direct | 404.253.8473 - fax randall.allen@alston.com



-----Original Message-----
From: Flint, David [mailto:dflint@SWFLLP.com]
Sent: Wednesday, June 05, 2013 8:28 AM
To: 'Alice_Snedeker@gand.uscourts.gov'; Allen, Randall
Cc: aatkins@velaw.com; bmcculley@mcculleymccluer.com; Bruce Pixley; BREIN@WILEYREIN.COM;
bwood@rpwb.com; cale@conleygriggs.com; CHarley@chitwoodlaw.com; dbain@bain-law.com;
dgustafson@gustafsongluek.com; dhedlund@gustafsongluek.com; dkotchen@kotchen.com;
dlow@kotchen.com; garenson@kaplanfox.com; goldman@gsk-law.com; g.blanchfield@rwblawfirm.com;
hrowell@rpwb.com; jabraham@aftlaw.com; jad@davis-adams.com; jdenvir@bsfllp.com;
jhartman@mofo.com; jward@rpwb.com; lnussbaum@gelaw.com; mchitwood@chitwoodlaw.com; Kraynak,
Michelle; mmitchell@bsfllp.com; Berreth, Nowell; psanders@sgrlaw.com; RFones@mofo.com;
richard@conleygriggs.com; rkaplan@kaplanfox.com; rkillorin@chitwoodlaw.com;
rklinck@kotchen.com; Rutherford, Sam; sgant@bsfllp.com; smccluer@mcculleymccluer.com;
trhodes@sgrlaw.com; ZBanks@chitwoodlaw.com
Subject: RE: 09-md-2089-TCB Delta/AirTran MDL: Rescheduling June 18 hearing

Plaintiffs' counsel requests  a copy of the Pixley report prior to the hearing.  Without
studying this report there is no way we can have any meaningful participation in the
proceeding.  Please ask Judge Batten if the Court can furnish a copy to us subject to
whatever conditions he deems appropriate.

-----Original Message-----
From: Alice_Snedeker@gand.uscourts.gov [ mailto:Alice_Snedeker@gand.uscourts.gov]
Sent: Wednesday, June 05, 2013 8:17 AM
To: Allen, Randall
Cc: aatkins@velaw.com; bmcculley@mcculleymccluer.com; Bruce Pixley; BREIN@WILEYREIN.COM;
bwood@rpwb.com; cale@conleygriggs.com; CHarley@chitwoodlaw.com; dbain@bain-law.com; Flint,

David; dgustafson@gustafsongluek.com; dhedlund@gustafsongluek.com; dkotchen@kotchen.com; dlow@kotchen.com; garenson@kaplanfox.com; goldman@gsk-law.com; g.blanchfield@rwblawfirm.com; hrowell@rpwb.com; jabraham@aftlaw.com; jad@davis-adams.com; jdenvir@bsfllp.com; jhartman@mofo.com; jward@rpwb.com; lnussbaum@gelaw.com; mchitwood@chitwoodlaw.com; Kraynak, Michelle; mmitchell@bsfllp.com; Berreth, Nowell; psanders@sgrlaw.com; RFones@mofo.com; richard@conleygriggs.com; rkaplan@kaplanfox.com; rkillorin@chitwoodlaw.com; rklinck@kotchen.com; Rutherford, Sam; sgant@bsfllp.com; smccluer@mcculleymccluer.com; trhodes@sgrlaw.com; ZBanks@chitwoodlaw.com
Subject: RE: 09-md-2089-TCB Delta/AirTran MDL: Rescheduling June 18 hearing

Yes, that date is still clear. An order rescheduling the hearing will be issued some time today.

Alice Snedeker
Law Clerk, Hon. Timothy C. Batten, Sr.
United States District Court
Northern District of Georgia
404-215-1418
alice_snedeker@gand.uscourts.gov


From:    "Allen, Randall" <Randall.Allen@alston.com>
To:        "Alice_Snedeker@gand.uscourts.gov"
           <Alice_Snedeker@gand.uscourts.gov>, "BREIN@WILEYREIN.COM"
           <BREIN@WILEYREIN.COM>, "CHarley@chitwoodlaw.com"
           <CHarley@chitwoodlaw.com>, "RFones@mofo.com" <RFones@mofo.com>,
           "ZBanks@chitwoodlaw.com" <ZBanks@chitwoodlaw.com>,
           "aatkins@velaw.com" <aatkins@velaw.com>,
           "bmcculley@mcculleymccluer.com"
           <bmcculley@mcculleymccluer.com>, "bwood@rpwb.com"
           <bwood@rpwb.com>, "cale@conleygriggs.com"
           <cale@conleygriggs.com>, "dbain@bain-law.com"
           <dbain@bain-law.com>, "dflint@swfllp.com" <dflint@swfllp.com>,
           "dgustafson@gustafsongluek.com"
           <dgustafson@gustafsongluek.com>, "dhedlund@gustafsongluek.com"
           <dhedlund@gustafsongluek.com>, "dkotchen@kotchen.com"
           <dkotchen@kotchen.com>, "dlow@kotchen.com" <dlow@kotchen.com>,
           "g.blanchfield@rwblawfirm.com" <g.blanchfield@rwblawfirm.com>,
           "garenson@kaplanfox.com" <garenson@kaplanfox.com>,
           "goldman@gsk-law.com" <goldman@gsk-law.com>, "hrowell@rpwb.com"
           <hrowell@rpwb.com>, "jabraham@aftlaw.com"
           <jabraham@aftlaw.com>, "jad@davis-adams.com"
           <jad@davis-adams.com>, "jdenvir@bsfllp.com"
           <jdenvir@bsfllp.com>, "jhartman@mofo.com" <jhartman@mofo.com>,
           "jward@rpwb.com" <jward@rpwb.com>, "lnussbaum@gelaw.com"
           <lnussbaum@gelaw.com>, "mchitwood@chitwoodlaw.com"
           <mchitwood@chitwoodlaw.com>, "mkraynak@swfllp.com"
           <mkraynak@swfllp.com>, "mmitchell@bsfllp.com"
           <mmitchell@bsfllp.com>, "Berreth, Nowell"
           <Nowell.Berreth@alston.com>, "psanders@sgrlaw.com"
           <psanders@sgrlaw.com>, "richard@conleygriggs.com"
           <richard@conleygriggs.com>, "rkaplan@kaplanfox.com"
           <rkaplan@kaplanfox.com>, "rkillorin@chitwoodlaw.com"
           <rkillorin@chitwoodlaw.com>, "rklinck@kotchen.com"
           <rklinck@kotchen.com>, "Rutherford, Sam"
           <Sam.Rutherford@alston.com>, "sgant@bsfllp.com"

            <sgant@bsfllp.com>, "smccluer@mcculleymccluer.com"
            <smccluer@mcculleymccluer.com>, "trhodes@sgrlaw.com"
            <trhodes@sgrlaw.com>, Bruce Pixley
            <bpixley@precisiondiscovery.com>
Date:       06/04/2013 04:53 PM
Subject:                RE: 09-md-2089-TCB Delta/AirTran MDL:  Rescheduling
June 18
            hearing


Dear Ms. Snedeker,

After conferring with all parties, it appears that June 21st is the best date for the
rescheduled hearing.  Please let us know if that date is still clear on the Court's calendar
or if you need anything further from the parties before the hearing.

Thanks,
Randall


Randall L. Allen
Alston & Bird LLP
1201 W. Peachtree St. | Atlanta, Ga. 30309
404.881.7196 – direct | 404.253.8473 – fax randall.allen@alston.com



    -----Original Message-----
    From: Alice_Snedeker@gand.uscourts.gov [ mailto:Alice_Snedeker@gand.uscourts.gov]
    Sent: Monday, June 03, 2013 4:28 PM
    To: BREIN@WILEYREIN.COM; CHarley@chitwoodlaw.com; RFones@mofo.com; ZBanks@chitwoodlaw.com;
    aatkins@velaw.com; bmcculley@mcculleymccluer.com; bwood@rpwb.com; cale@conleygriggs.com;
    dbain@bain-law.com; dflint@swfllp.com; dgustafson@gustafsongluek.com;
    dhedlund@gustafsongluek.com; dkotchen@kotchen.com; dlow@kotchen.com;
    g.blanchfield@rwblawfirm.com; garenson@kaplanfox.com; goldman@gsk-law.com; hrowell@rpwb.com;
    jabraham@aftlaw.com; jad@davis-adams.com; jdenvir@bsfllp.com; jhartman@mofo.com;
    jward@rpwb.com; lnussbaum@gelaw.com; mchitwood@chitwoodlaw.com; mkraynak@swfllp.com;
    mmitchell@bsfllp.com; Berreth, Nowell; psanders@sgrlaw.com; Allen, Randall;
    richard@conleygriggs.com; rkaplan@kaplanfox.com; rkillorin@chitwoodlaw.com;
    rklinck@kotchen.com; Rutherford, Sam; sgant@bsfllp.com; smccluer@mcculleymccluer.com;
    trhodes@sgrlaw.com; Bruce Pixley
    Subject: 09-md-2089-TCB Delta/AirTran MDL: Rescheduling June 18 hearing


Counsel,

Bruce Pixley, the discovery expert, has a conflict with the June 18 hearing date, so we need
to reschedule the hearing. Judge Batten is available any day next week (with some time
constraints but if necessary we can try to move other hearings) and June 21st. The judge
would like to have the hearing before July if possible.

Please confer and let me know if there is a new date that works for all parties and the
discovery experts. I've included Bruce on this email chain.

Thank you,

```
Alice Snedeker
Law Clerk, Hon. Timothy C. Batten, Sr.
United States District Court
Northern District of Georgia
404-215-1418
alice_snedeker@gand.uscourts.gov
```

NOTICE: This e-mail message and all attachments may contain legally privileged and
confidential information intended solely for the use of the addressee. If you are not the
intended recipient, you are hereby notified that you may not read, copy, distribute or
otherwise use this message or its attachments. If you have received this message in error,
please notify the sender by email and delete all copies of the message immediately.